CARL HERMAN AND HARRIETT HERMAN, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 344–82, 345–82, 347–82, 450–82, 709–82, 715–82, 746–82, 751–82, 1753–82, 2019–82, 2597–82, 9154–82, 9161–82, 14689–82.　　Filed January 30, 1985.

[1]Cases of the following petitioners are consolidated herewith: Peter J. Guthorn and Katherine T. Guthorn, docket No. 345–82; Robert A. Heitner and Elizabeth Heitner, docket No. 347–82; William J. Esposito and Marie Esposito, docket No. 450–82; Richard Jacobs and Sheila J. Jacobs, docket No. 709–82; John J. Keyser and Anne M. Keyser, docket No. 715–82; Steven Lefrak and Phyllis Lefrak, docket No. 746–82; Nayan Kothari and Grace Kothari, docket No. 751–82; Nayan Kothari, M.D., P.A., docket No. 1753–82; Bernard Ehrenberg and Betty Ehrenberg, docket No. 2019–82; Joseph Marchesano and Catherine Marchesano, docket No. 2597–82; Estate of Nathaniel R. Avella, Deceased, Carolyn D. Avella and Charles J. Clarke, Jr., Executors, and Carolyn D. Avella, docket No. 9154–82; Ho-Hsiung Chang and Yei-Er-Kao Chang, docket No. 9161–82; and Alden Hall and Audrey Hall, docket No. 14689–82.

*Terence Heaney*, for the petitioners.
*William Halley* and *Matthew Magnone*, for the respondent.

PANUTHOS, *Special Trial Judge*: These consolidated cases were heard pursuant to the provisions of section 7456(d)[2] and General Order No. 8 of this Court, 81 T.C. XXIII (1983).

Respondent issued statutory notices of deficiency in these consolidated cases which determined deficiencies in petitioners' 1977 Federal income taxes as follows:

| Docket No. | Deficiency | Docket No. | Deficiency |
|---|---|---|---|
| 344–82 | $1,423.01 | 751–82 | $2,954.00 |
| 345–82 | 3,979.23 | 1753–82[4] | 529.80 |
| 347–82 | 1,385.95 | 2019–82 | 769.54 |
| 450–82 | 1,494.66 | 2597–82 | 1,388.36 |
| 709–82 | 4,648.57 | 9154–82 | 4,795.00 |
| 715–82[3] | 2,786.19 | 9161–82 | 2,494.00 |
| 746–82 | 1,325.50 | 14689–82 | 2,415.00 |

Upon motion of the parties, the above cases were consolidated for purposes of trial, briefing, and opinion. These cases have been selected by the parties as representative of the various fact patterns involved in a substantial number of other cases.[5]

---

[2]All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

[3]On brief, respondent conceded to this case in full.

[4]Fiscal year ended June 30, 1978.

[5]There are in excess of 100 docketed cases where the parties have agreed to be bound by the Court's opinion in these consolidated cases.

Respondent determined the deficiencies in these cases based on the disallowance of a claimed deduction for the purchase of a subordinated loan certificate (hereinafter SLC); the inclusion of unreported dividend income of shareholder/employees; and the inclusion of unreported additional compensation in the income of shareholder/employees.[6] The dividend and additional compensation income determined by respondent is based on the purchase of an SLC by a professional corporation (hereinafter P.C.) and issued in the name of an individual physician.

The issues for decision are (1) whether payments by individual physicians or P.C.'s to purchase an SLC constitutes an ordinary and necessary business expense under section 162(a), or a capital expenditure; (2) whether payments for an SLC by a P.C. for its shareholder/employee physician constitute a dividend under section 301(a), section 301(c), and section 316(a); and (3) whether the purchase of an SLC by a P.C. for its nonshareholder/employee physician constitutes additional compensation under section 61.

Some of the facts in this case have been stipulated and are incorporated herein by this reference. At the time of filing the petition in this case, all of the petitioners were residents of New Jersey.[7]

FINDINGS OF FACT

### 1. Background

Because these are consolidated cases, there are several different factual patterns to address. We will begin by outlining the background upon which these various factual patterns must be superimposed.

During the 1970's, the cost of medical malpractice insurance in the State of New Jersey rose dramatically. By the mid-1970's, the continued existence of a private underwriter for medical malpractice insurance became increasingly uncertain. As of October 1976, the only insurers offering malpractice insurance to New Jersey physicians were two subsidiary

---

[6]Respondent concedes with respect to Richard and Sheila Jacobs, docket No. 709–82, that constructive dividend treatment is only available to the extent of earnings and profits, making any excess distribution a return of capital.

[7]Petitioner Nayan Kothari, M.D., P.A., docket No. 1753–82, a professional corporation (P.C.) had its principal place of business in New Jersey.

insurance companies of Chubb & Son, Inc. (Chubb). As a result of this increasingly narrow market, the New Jersey legislature enacted chapter 30D, title XVII, Medical Malpractice Liability Insurance Act (N.J. Stat. Ann. sec. 17:30D, et seq. (West 1976)). Under the act, the commissioner of insurance of the State of New Jersey was empowered to activate a reinsurance association if he found that medical malpractice insurance was not readily available for any category or subcategory of insurance to which the act applied. In October of 1976, only one of the Chubb subsidiaries was offering medical malpractice insurance, generally, to all types of physicians in New Jersey. Sometime after October 1976, that subsidiary informed the commissioner of insurance that it intended to withdraw from providing medical malpractice insurance in New Jersey, effective February 1, 1977, unless the State activated the insurance provisions of the Medical Malpractice Liability Insurance Act.

The Medical Society of New Jersey was dissatisfied with the prospect of activation of the reinsurance association. Such dissatisfaction stemmed from several causes: (1) That the physicians would have little influence on the policy decisions and operations of the reinsurance association; (2) that they would not be represented as members of the governing body of such association; (3) that the reinsurance association would probably require higher premiums; (4) that excess losses would be assessable against the insured physicians; (5) that the reinsurance association would more deeply inject government into the affairs of New Jersey physicians; and (6) that there was no guarantee that physicians would not be charged a surplus contribution to provide for establishment of a recovery fund.

The principal concern among these was the assessable nature of the insurance policy that would be offered through the reinsurance association. An assessable policy is one in which, after losses have been determined at the end of the year, the insurance company has the right to assess, on a pro rata basis, all policyholders to make up for any net loss incurred during the previous insurance period. A nonassessable policy, on the other hand, is one in which a physician pays his policy premium, and thereafter cannot be assessed any additional amounts for the year to which those premiums apply. Thus, a nonassessable policy may cost more each year,

but will not cost more retroactively as a result of the claims history of the insured group of physicians during the term to which the original insurance policy applied.

The Medical Society decided that the formation of a physician-owned insurance carrier was the best means for providing malpractice insurance for physicians in New Jersey. Accordingly, in October of 1976, the Medical Society organized the Medical Inter-Insurance Exchange of New Jersey (hereinafter Exchange) as a physician-owned reciprocal inter-insurance exchange, under the provisions of chapter 50, title XVII of the New Jersey Statutes (N.J. Stat. Ann. sec. 17:50 (West 1976)).

The commissioner of insurance issued a permit to the Exchange to solicit insurance applications for organizational purposes. After obtaining the required number of applications for insurance, the Exchange was issued a certificate of authority from the commissioner of insurance.

Under New Jersey law, the Exchange was required to establish and maintain, as an asset, a surplus of cash and/or authorized securities of not less than the amount of the minimum capital and surplus required for a stock insurance company to write the same kind or kinds of insurance. Premiums or contributions to the Exchange, which was organized as an unincorporated association whose members are policyholders, were made by prospective members to provide a pool of assets from which claims against the members (to the extent covered by the contract of insurance) and the expenses of the Exchange are paid.[8] The Exchange issued only nonassessable policies. However, the Exchange could not begin to write nonassessable insurance policies until it had obtained an initial surplus of at least $750,000.

A physician becomes a member of the Exchange at such time as the Exchange issues an insurance policy to such physician. Membership automatically terminates upon expiration of the insurance policy. Thus, members of the Exchange are those physicians insured by the Exchange. Each member of the Exchange is entitled to one vote at all meetings of members. To be insured by the Exchange, a physician must be licensed to practice medicine in the State of New Jersey, must

---

[8]Because the Medical Inter-Insurance Exchange of New Jersey (Exchange) is currently an operating organization, we will use verbs in their present tense where appropriate.

have at least 75 percent of his practice therein, and must have an SLC issued in his or her name.

In order to provide the Exchange with surplus, and for the purpose of establishing a sound base to support the issuance of insurance policies, SLC's were issued. Any physician residing in New Jersey who wanted to purchase medical malpractice insurance from the Exchange was required, as a condition of obtaining such insurance, to purchase an SLC from the Exchange in an amount related to the speciality classification of his medical practice. The required amount to be paid for such a certificate ranged from $1,325 for low-risk classifications to $7,800 for high-risk classifications.[9] The certificates were issued for the sole purpose of providing surplus for the Exchange. They were not offered as an investment, they bore no interest, they contained a restrictive legend which made them nontransferable, and the holder of such certificate had no right to a redemption for the face value of the certificate. The certificates were exempt from registration under the Securities Exchange Act of 1933,[10] and under the New Jersey Uniform Securities Law.[11]

The certificates were issued only to, and in the names of, individual physicians who were prospective members of the Exchange. They were registered in the names of those individual physicians on the books of the Exchange. Because of the perceived need for a rapid solution to the lack of acceptable insurance coverage, and the filing, registration, and notice requirements under both Federal and State securities laws, no loan certificates were authorized to be issued to any partnership or corporation whose physicians were insured by the Exchange. The proceeds from the certificates were treated by the Exchange as surplus. Although segregated on its account books, funds received from the certificates and from insurance

[9]Nonresident physicians, although ineligible to purchase a subordinated loan certificate (SLC), were required to pay an initial nonrefundable premium surcharge in the same amount as the payment for an SLC required of resident physicians for the same speciality classification. Because all of the petitioners in these cases are residents of New Jersey or had their principal office located therein, we make no determination as to the treatment of payments made to the Exchange, by either an individual physician or a P.C., for nonresident physicians, as a basis for the provision of insurance.

[10]We assume the parties mean either the Securities Act of 1933, 48 Stat. 74, 15 U.S.C. sec. 77a, et seq., or the Securities Exchange Act of 1934, 48 Stat. 881, 15 U.S.C. sec. 78a, et seq.

[11]Uniform Securities Law (1967), N.J. Stat. Ann. sec. 49:3-47, et seq.

premium payments were commingled in the Exchange's bank accounts.

Upon issuance of the certificates, the Exchange intended to redeem them only in cases where the physician ceased practicing medicine in New Jersey, *and* was no longer insured by the Exchange. It was intended that the certificate would be redeemed only when the physician died, retired from the practice of medicine, or moved his practice out of the State of New Jersey. In the event that one of those conditions was satisfied, however, no guarantee was given that any or all of the principal amount of such certificate would be repaid.

In the event that the Exchange were liquidated, all of the assets of the Exchange, after payment of outstanding liabilities, including repayment of any outstanding SLC's, would be distributed to the persons who were members of the Exchange at the time of liquidation.

To date, all member physicians who subscribed for SLC's and who either died, retired from the practice of medicine in New Jersey, or moved their practice out of the State of New Jersey did, in fact, receive a repayment of the principal amounts of the SLC's. However, a physician changing to another insurer within the State of New Jersey would not be repaid the principal amount of his certificate at such time. Payments would only be made in this instance upon retirement, death, or movement of practice from New Jersey. At the time of trial, the Exchange insured approximately 7,000 physicians in New Jersey, which constituted approximately 64 percent of the total medical malpractice insurance market for the State.

In 1976, the Commissioner of Insurance of New Jersey activated the reinsurance provisions of the Medical Malpractice Liability Insurance Act with respect to medical malpractice insurance. One of the Chubb subsidiaries was to act as a "designated provider" of malpractice insurance and was 100-percent reinsured by the New Jersey Medical Malpractice Reinsurance Association pursuant to chapter 30D. Chubb, through its subsidiary, remained as a provider under the reinsurance provisions until it ceased to provide medical malpractice insurance in New Jersey in the spring of 1979. In 1978, the Medical Malpractice Liability Insurance Act was amended to allow the reinsurance association to directly write

medical malpractice insurance. Upon withdrawal of Chubb from the State, the reinsurance association began to directly write such insurance.

In the first year of operation, the premiums charged by the Exchange were the same as the premiums charged by the Chubb subsidiary acting as a 100-percent reinsured "designated provider" under the New Jersey State reinsurance provisions. At the time of trial, there were four carriers writing medical malpractice insurance in New Jersey. Of the four, the premiums charged by the Exchange were the highest across the board.

## 2. Findings—Specific Petitioners

These consolidated cases represent an effort to identify several fact patterns, each of which we will outline before determining the result of each case. Each of the relevant fact patterns is represented in the following chart:

| Docket No | Petitioners[1] | Percent shareholders | SLC cost deducted by PC | Repayment agreement Oral | Written | No | Repayment[2] ever made |
|---|---|---|---|---|---|---|---|
| | Group I | | | | | | |
| 344–82 | Carl and Harriet Herman | 100 | No | X | | | No |
| 345–82 | Peter J. and Katherine T. Guthorn | 100 | No | | X | | Yes - 12/5/80 |
| 2597–82 | Joseph and Catherine Marchesano | 100 | Yes | X | | | No |
| | Group II | | | | | | |
| 751–82 | Nayan and Grace Kothari | 90/100 | Yes | X | | | No |
| 746–82 | Steven and Phyllis Lefrak | 50 | Yes | | X | | No |
| 14689–82 | Alden and Audrey Hall | 26 | Yes | X | | | Repayment by estimate of Dr. Bruno Zaneski - 1978 |
| 347–82 | Robert A. and Elizabeth Heitner | 25 | No | X | | | No |
| 709–82 | Richard and Sheila Jacobs | 25 | No | | X | | No |
| 450–82 | William J. and Marie Esposito | 16 2/3 | ·Yes | X | | | Another shareholder repaid in 1978 - Dr. Robert Cavallino |
| 9154–82 | Estate of Nathaniel R. Avella, deceased, Carolyn D. Avella and Charles Clarke, Jr., executors, Carolyn Avella | 14.23 | Yes | | X | | Yes, by several physicians |
| | Group III | | | | | | |
| 715–82 | John J. and Anne M. Keyser[3] | 0 | No | X | | | No |
| 9161–82 | Ho-Hsiung and Yei-Er-Kao Chang | 0 | Yes | | X | | No |
| | Group IV | | | | | | |
| 1753–82 | Nayan Kothari, M.D., P.A. | N/A | Yes | | | | No |
| 2019–82 | Bernard and Betty Ehrenberg | Sole proprietorship | Yes | N/A | N/A | N/A | No |

[1]Underlining represents taxpayer-physicians. Spouses are listed because taxpayers filed joint returns.
[2]Those physicians not having their respective corporations are still practicing medicine in New Jersey.
[3]Conceded in full by respondent.

The above chart breaks down the fact patterns in four basic groups: I. Physicians with a 100-percent interest; II. Physicians with a fractional interest; III. Physicians who had no equity interest in the P.C. and were employees; IV. A P.C. and a sole proprietorship. Within each of the first three groups there are two categories. Category I consists of those physicians whose P.C.'s deducted the cost of SLC's purchased in the name of a practicing physician. Category II physicians are those whose P.C.'s did not deduct the cost of the certificates.[12] Also within each of the first three groups, there are individual physicians who as either shareholder/employees or as nonshareholder/employees had one of the following: (1) A written agreement between the physician and P.C. that the physician would repay the P.C. upon redemption of the SLC by the Exchange, or (2) an oral agreement or understanding the terms of which are the same as in (1) above. In the fourth group, the P.C. and the sole proprietorship, the issue presented is the deductibility of the payment of the SLC.[13]

At trial, a number of physicians testified with respect to their particular factual pattern. Each also testified that without malpractice insurance, he or she would have significantly curtailed, or ceased altogether, his or her medical practice. In those cases where the cost of SLC's was not deducted, the SLC was listed as a corporate asset and described variously as "subordinated note," "deposits-insurance," or "medical malpractice deposit." In each of the cases where a deduction was claimed, it was treated as an insurance expense by the physician or his or her accountant. Each of the physicians had an employment agreement which, among other things, required the P.C. to pay for malpractice insurance. At trial, those physicians who did deduct the cost of the certificate testified that they regarded the purchase of the certificate as

---

[12]In this latter category, the deficiency arose from respondent's inclusion of additional income to shareholder and nonshareholder/employees.

[13]The case of Nayan Kothari, M.D., P.A., docket No. 1753–82, involves a P.C.; the two shareholders who in combination own 100 percent of the P.C. are Nayan and Grace Kothari (husband and wife), petitioners in docket No. 751–82. There is no representative case involving a P.C. as a petitioner where a deduction for the purchase of an SLC on behalf of a nonshareholder/employee was disallowed.

Nevertheless, even though this issue does not arise from a viewpoint of the deduction by the P.C., we do have the issue relating to petitioners in group III as to whether the purchase of the SLC by the P.C. represents additional compensation to the nonshareholder/employee. Presumably, if the purchase of the SLC did represent compensation to the nonshareholder/employee, then the P.C. would be entitled to a deduction for compensation paid to its employee.

an additional cost of obtaining malpractice insurance. Thus, in their view, the certificate amounted to no more than an additional premium required of them prior to their being able to obtain insurance from the Exchange.[14]

## OPINION

These cases present difficult and unique issues for determination. Respondent has determined that the payments made by the individual physicians to purchase the loan certificates constitute capital expenditures and are therefore not deductible as ordinary and necessary business expenses under section 162.[15] With respect to the nature of the expense for the loan certificate, petitioners are split; some of them treated the SLC's as a capital asset and recorded it as such on the corporate books; others treated the cost of the certificate as a currently deductible expense attributable to the purchase of medical malpractice insurance.

Respondent also determined that the purchase of an SLC by a P.C. for its shareholder/employees on the one hand, and for its non shareholder/employees on the other, constitutes, in the former case, a corporate distribution that is a dividend under section 301, and in the latter, additional compensation under section 61.[16]

Petitioners argue that the cost of the SLC constitutes an ordinary and necessary business expense under section 162 and is deductible in the year incurred. Petitioners' argument is based on the unavailability of medical malpractice insurance in New Jersey in 1977. With respect to respondent's argument with regard to the dividend and extra-compensation income issues, petitioners assert that the legal limitations

---

[14]It should be noted that there is no dispute as to the deductibility of the annual premiums for medical malpractice insurance. The dispute relates to the initial payment for the (SLC). Respondent concedes that annual insurance premiums paid for policies issued in conjunction with the certificates are deductible.

[15]Note 14 *supra*.

[16]Respondent also suggests that with respect to those petitioners who have written agreements to repay the P.C. amounts received in redemption of the SLC, such amounts constitute an interest-free loan from the corporation to the employee for the period of time that the employee continues to hold the certificate. Respondent chose not to develop this argument. Additionally, neither respondent nor petitioners suggest that, to the extent the value of an SLC received by shareholder/employees did not correspond to their pro rata interest in the P.C., it was a dividend only to the extent of their interest with any remainder being additional compensation. See note 13 *supra*. Because of our decision in this case, we need not consider these questions further.

imposed on the Exchange by Federal and State security laws, in conjunction with the limited rights that attended ownership of an SLC, i.e., the right to buy an insurance policy, do not, in any meaningful sense, rise to the level of a constructive dividend or of additional compensation. We will address the issues in order.

### 1. Deductibility of Payment for Subordinated Loan Certificates

Initially, we must determine whether the P.C. is entitled under section 162 to deduct as a business expense the cost of purchasing the SLC. Whether or not an item is currently deductible turns on the facts of the case.

Section 162(a) provides that there will be allowed as a deduction all of the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The question is essentially one of fact. *Walliser v. Commissioner*, 72 T.C. 433, 437 (1979); *Commissioner v. Heininger*, 320 U.S. 467, 475 (1943). Deductions are a matter of legislative grace. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Respondent's determinations are presumptively correct, and the burden of proof rests with petitioners. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a). The facts of this case lead to the conclusion that the cost of the SLC, while a necessary expense if the physicians were to obtain medical malpractice insurance, was not an ordinary expense within the meaning of section 162. *Boser v. Commissioner*, 77 T.C. 1124 (1981) (see also 79 T.C. II), affd. in an unpublished opinion (9th Cir., Dec. 22, 1983).

This Court has considered, on many occasions, whether or not an expense qualified as an ordinary and necessary business expense under section 162. See, e.g., *Jordan v. Commissioner*, 60 T.C. 770 (1973) (lobbying expense allowed); *Smith v. Commissioner*, 33 T.C. 861 (1960) (meal expense for guest but not taxpayer allowed); *Walliser v. Commissioner, supra* (traveling expense disallowed).[17] To qualify as an allowable deduction under section 162(a) an item must (1) be paid or incurred

---

[17]See generally *Bender v. Commissioner*, T.C. Memo. 1982–134; *Justice Steel, Inc. v. Commissioner*, T.C. Memo. 1980–466; *Brown v. Commissioner*, T.C. Memo. 1979–434; *Drury v. Commissioner*, T.C. Memo. 1977–199.

during the taxable year; (2) be for carrying on any trade or business; (3) be an expense; (4) be a necessary expense; and (5) be an ordinary expense. *Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 352 (1971). It is clear from the facts of this case that petitioners have satisfied three of the five requirements for deductibility under section 162. There is no question that the payments were made during the taxable year to which they relate, and that they were made in carrying on a trade or business. Similarly, there is no disagreement as to the necessity of such payments. It is quite clear that without the payment, many, if not all, of the physicians would have ceased to practice medicine or significantly diminished their practice of medicine in the State of New Jersey. However, the facts of this case compel the conclusion that the payment for the SLC's was neither an "expense," nor an "ordinary" expense within the meaning of section 162(a). *Welch v. Helvering*, 290 U.S. 111 (1933).

As used in section 162, an "ordinary" expense has been defined as one which is "normal, usual, or customary" in the taxpayer's trade or business. *Boser v. Commissioner, supra* at 1132; *Deputy v. du Pont*, 308 U.S. 488, 494–495 (1940). In the present case, the facts do not support petitioners' position when the standard enunciated in *Boser v. Commissioner, supra*, is applied.

The crux of petitioners' argument is that the expense was ordinary because all physicians in the State of New Jersey were similarly situated, needed medical malpractice insurance, in large part purchased SLC's from the Exchange, and therefore the payment for the certificates became "ordinary." We disagree. We believe that the facts of this case effectively rebut petitioners' argument.

As the Supreme Court stated in *Commissioner v. Lincoln Savings & Loan Association, supra* at 354:

> What is important and controlling, we feel, is that the * * * payment serves to create or enhance for [the taxpayer] what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under section 162(a) in the absence of other factors not established here.

In the present case, payments made to the Exchange by individual physicians or their P.C.'s serve to provide the

capital basis upon which the insurance exchange could be formed. In exchange for the contributions of capital made to the Exchange by the physicians or their corporations, SLC's were issued in the names of individual physicians. Although not transferable nor immediately redeemable, it was the practice and intent of the Exchange to redeem these certificates upon the retirement, death, or departure from the State of New Jersey of the individual physicians. The Exchange identified the individual accounts of each certificate holder and, though it commingled its assets, was able to account for amounts paid in for the SLC's, on the one hand, and annual premium payments for medical malpractice insurance, on the other.

In the event that the exchange ceased to do business, after payments of liabilities to all creditors or other people with rights to its assets, and prior to payments of any remaining assets to the policy members who represented members of the Exchange, all outstanding SLC's would be repaid. The certificates were subordinated only as to other debts or other liabilities of the Exchange, but not to the interest of the member policyholders. Such prospective refund would be made on a pro rata basis to each of the certificate holders, based upon the respective amount of money paid for the certificate.

We also note that the structure of the Exchange was determined in part by the requirements of State and Federal security laws. The notes were issued in the form they were, and to the people to whom they were issued, because of the requirements and limitations of those laws. However, the fact remains that, in exchange for capital contributions, the Exchange issued loan certificates, subordinate only to other lienholders or creditors of the Exchange, and that these certificates would likely be redeemed at some future time. In fact, the certificates look more like securities, the cost of which is capital in nature and is not deductible, than like some additional insurance premium. *David R. Webb Co. V. Commissioner*, 77 T.C. 1134 (1981), affd. 708 F. 2d 1254 (7th Cir. 1983); *Firemen's Insurance Co. v. Commissioner*, 30 B.T.A. 1004 (1934).[18] The purchase of a certificate was an investment in a

---

[18]*Towne v. Commissioner*, T.C. Memo. 1977–356.

security which, it was hoped, would make possible a subsequent purchase of insurance.[19]

The Exchange was designed to provide a specific kind of insurance to a group of people in the State of New Jersey to make possible their practice of medicine. Sale of the certificates was needed to generate liquidity and availability of funds to satisfy claims against the member physicians. The issuance of the certificates is more like the sale and purchase of a capital asset than a deductible expense.[20] The fact that the physician had ongoing, annual insurance premium obligations to secure insurance coverage further buttresses this position. The annual insurance premiums were conceded as deductible by respondent.

Petitioners argue that they should be allowed to deduct the cost of the SLC's because there existed the possibility that they would not be redeemed. We do not find petitioners' argument compelling. This is so for several reasons: (1) All investments are at risk, and it is always possible that a note, a bond, or a stock issue could cease to be of value; (2) it was the intent and practice of the Exchange to pay the face value of any certificate upon the happening of one of the required precedent events; and (3) every physician who had satisfied one of those precedent conditions had in fact been repaid the face value of the certificates. Each of these factors, by itself and together, helps to outline the nature and characteristics of the certificates. The certificates are essentially a separate and distinct additional asset. *Commissioner v. Lincoln Savings & Loan Association, supra* at 354.

The certificates have the characteristics of both equity and debt. For example, they make it possible for those certificate holders who choose to purchase a policy, to participate in the management of the Exchange. Although they do not provide a return in the form of dividends or interest, they have been redeemed at face value and, barring any diminishing of the Exchange's assets, would be redeemed at face value at some time in the future. Thus, they look like debt instruments, at least with regard to their being redeemed at face value, but

---

[19]See, e.g., *Fitch v. Commissioner*, T.C. Memo. 1975–36; *Oster v. Commissioner*, T.C. Memo. 1964–335.

[20]The appropriate time for deduction of the cost of a certificate, if ever, would be when the Exchange refused to redeem it after satisfaction of the required conditions precedent.

like equity instruments with respect to the uncertainty of the date upon which they would be redeemed and the possibility of participating in the management of the Exchange.[21] It is, however, unnecessary for us to resolve the exact nature and characteristics of the instrument at issue. It is sufficient for us to decide, as we do, that the SLC's issued by the Exchange represent some kind of security instrument and that the purchase price for the certificates is not a currently deductible expense: the cost of the certificates represents the purchase of a capital asset with an indefinite useful life.

## 2. Recognition of Income by Employee

The remaining two issues for decision will be considered together. The question in each case is the effect on the shareholder/employee and nonshareholder/employee of the payment made by the P.C. to the Exchange for which an SLC was issued in the name of the individual physician. The question is whether or not, in the former case, the payment by the corporation for the certificate issued to the shareholder/employee constitutes a dividend within the meaning of section 301, and in the latter case, whether payment for the certificate constitutes additional compensation under section 61.

Respondent argues that any corporate distribution made to a shareholder is a dividend to the extent of the earnings and profits available for that purpose. Accordingly, respondent argues that the purchase of the SLC by the corporation and issued in the names of individual physicians constitutes a dividend with respect to those physicians who are shareholder/employees of the P.C. which paid for the certificates. With respect to the nonshareholder/employees of the P.C. in whose names the certificates were issued, respondent argues that payment for such certificates by the corporation constitutes additional compensation to the nonshareholder/employee.[22]

Petitioners, on the other hand, argue that the P.C.'s purchased the certificates for a substantial corporate purpose and that any personal benefit to shareholder or nonshareholder employees was incidental.

---

[21] *Klein v. Commissioner*, 75 T.C. 298, 302 (1980); cf. *Frantz v. Commissioner*, 83 T.C. 162 (1984).
[22] See notes 13 & 16.

For the reasons outlined below, we agree that the purchase of the SLC's by the P.C. does not constitute a dividend or additional compensation to the individual physician in whose name the certificate was issued.

In our view, the correct result should characterize the purchase of the certificates at the corporate level. That characterization having been made, the appropriate characterization of the payment for the certificates at the individual level should follow clearly. From the corporate perspective, these transactions are identical. Irrespective of the individual to whom the certificate is ultimately issued, each individual is an employee of the corporation and, in order for each to perform the services for which the corporation employs him, each must be insured. Indeed, there is nothing in the record to suggest that, at least with respect to those employees who are shareholders, that the face amount of the certificate issued by the Exchange represented individual shareholder/employees' pro rata interests in the P.C. In our view, the corporation purchased assets necessary to make it possible for their employees to perform their duties. They neither made a distribution nor incurred additional expenses. Rather, they acquired additional capital assets with an indefinite useful life, the face amount of which, though held in the names of their employees, the P.C.'s were entitled to upon the happening of one of the precedent conditions.[23] At no time did any individual employee have any right to a cash redemption from the Exchange in the face amount of the note which was issued in his or her name. To find otherwise would be to elevate form over substance, something which, when concerned about an underlying reality, we will not do. *Benjamin v. Commissioner*, 66 T.C. 1084 (1976), affd. 592 F.2d 1259 (5th Cir. 1979); *Ruefenacht v. O'Halloran*, 737 F.2d 320, 337 (3d Cir. 1984); *Strick Corp. v. United States*, 714 F.2d 1194, 1206 (3d Cir. 1983).

---

[23]Although not developed at trial, there is some question whether a P.C. could, upon departure of a physician, simply have the certificate reregistered in the name of a new physician employee of the corporation.

This view is buttressed by the fact that there was substantial testimony that each of the physicians had an agreement[24] with the various corporations that, in the event that one of the requisite precedents to payment of the face amount of the certificate were to occur, and the SLC were redeemed, the corporation would be repaid the face value of the certificate.[25] Though such testimony is arguably self-serving, we found the witnesses credible and forthright and accept their testimony on its face. Respondent presented no evidence to the contrary, nor did he suggest that such agreements were ineffective or otherwise illusory.[26] We find that each of the physicians had an agreement to repay his P.C. amounts paid to the physician by the Exchange in redemption of the certificate. Thus, whether a shareholder/employee or a nonshareholder/employee, no physician had an unconditional right to amounts paid upon redemption of the certificates; each was required to repay that money to the corporation. *North American Oil Consolidated v. Burnet*, 286 U.S. 417 (1932). There is no doubt that the employees benefited by the purchase of these corporate assets; the purchase allowed each to perform his or her services as a physician, and in turn be paid a salary based upon his or her ability to perform. Such, however, is the case with many, if not all, corporate assets. The mere fact that a corporation purchases a security instrument to enable its employees to perform their work does not make those assets, or some measure of their value, dividends or additional compensation, as the case may be, to those employees working for the corporation.[27]

---

[24]Oral promises of principals to pay appear to be outside the New Jersey Statute of Frauds, N.J. Stat. Ann. sec. 25:1, et seq. See also *Schoor Associates, Inc. v. Holmdel Heights Construction Co.*, 68 N.J. 95 (1975). In any event, because we consider the SLC's corporate assets, the form of an agreement to pay redeemed amounts to the P.C. is irrelevant.

[25]To the extent some of the petitioners did not testify, affidavits were submitted to the effect that they would have so testified. Respondent stipulated that they would testify to an agreement but withheld his right to object to the veracity of such testimony. At no time, however, did he make such an objection.

[26]See note 16.

[27]We need not determine at this time whether or not, upon terminating employment with a P.C., a shareholder or nonshareholder employee beginning a solo practice of medicine would have a taxable benefit, i.e., the use of a corporate asset (the certificate), making possible the purchase of malpractice insurance for the physician in his individual capacity. See note 23.

*Decisions will be entered for the petitioners in docket Nos. 344-82, 345-82, 347-82, 450-82, 709-82, 715-82, 746-82, 751-82, 2597-82, 9161-82, and 14689-82.*

*Decisions will be entered for the respondent in docket Nos. 1753-82 and 2019-82.*

*Decision will be entered under Rule 155 in docket No. 9154-82.*