PHILIP SPILL, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Spill v. Commissioner
Docket Nos. 23115-84; 23116-84; 23117-84.
United States Tax Court
T.C. Memo 1989-213; 1989 Tax Ct. Memo LEXIS 213; 57 T.C.M. (CCH) 314; T.C.M. (RIA) 89213; May 4, 1989
Sanford Amdur, for the petitioners. Jody Tancer and Michelle A. Missry, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent has determined the following deficiencies and additions to tax: Taxable Year
Section 6653(b) [2]
Petitioner(s)
Ending
Deficiency
Addition
Filly's Fashions, Inc.
6/30/77
$ 105,127.00
$ 52,564.00
6/30/78
171,235.00
85,618.00
Philip Spill
12/31/77
76,144.00
38,072.00
12/31/78
123,626.00
61,813.00
Philip and Florence Koltun
12/31/77
62,918.00
31,459.00
12/31/78
111,789.00
55,894.00
*215 The issues presented by the instant case are: (1) whether petitioner Filly's Fashions, Inc., underreported its sales for the taxable years in issue; (2) whether petitioners Philip Spill and Florence Koltun received constructive dividends from petitioner Filly's Fashions, Inc., during the taxable years in issue; (3) whether petitioners are liable for additions to tax for fraud under section 6653(b); and (4) whether the statute of limitations bars assessments against petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Filly's Fashions, Inc. ("Filly's"), had its principal place of business in Brooklyn, New York, when it filed its petition. Petitioner Philip Spill ("Mr. Spill") resided in Lawrence, New York, when he filed his petition. Petitioners Philip and Florence Koltun ("Mr. Koltun" and "Mrs. *216 Koltun") are married and resided in Woodmere, New York, when they filed their petition. Filly's is a New York corporation engaged primarily in the retail sale of women's clothing. During the period in issue, it was owned in equal shares by Mr. Spill and Mrs. Koltun. Mr. Spill and Mrs. Koltun operated stores in Brooklyn, New York and Hewlitt, New York, while Mr. Koltun performed various duties for Filly's, including tallying sales receipts and making bank deposits. Approximately once a month, Ms. Ellen Karo, a CPA, would prepare the corporate books. Filly's also employed a bookkeeper for day-to-day record keeping. Filly's maintained a "cash receipts journal," which actually reflected deposits made to the corporate bank accounts, and a "cash disbursements journal," which actually reflected checks drawn on the corporate bank accounts. Filly's paid its employees, including Mr. Spill and Mrs. Koltun, in cash. Mr. Spill and Mrs. Koltun withdrew equal amounts as compensation. Ms. Karo prepared the corporate tax returns for the years in issue. Ms. Karo computed the amounts reported as "gross sales" by adding the "cash payroll" to amounts recorded on the cash receipts journal. *217 Respondent's determinations are based largely upon information supplied to respondent by Walter Fagin ("Mr. Fagin") and Sylvia Goldstein ("Mrs. Goldstein"). Specifically, Mr. Fagin and Mrs. Goldstein gave respondent a copy of a purported "second set of books" reflecting the true daily sales of Filly's. According to Mr. Fagin and Mrs. Goldstein, the second set of books, labelled "Beat Yesterday," (the "Beat Yesterday book") contained a record of daily sales by Filly's and permitted comparison of the sales for a given date with sales on the same date in earlier years. Mr. Fagin and Mrs. Goldstein also told respondent's agent that true sales by Filly's were not reported on its tax returns and that the owners of Filly's, Mr. Spill and Mrs. Koltun, diverted store receipts in the form of cash and checks made payable to "cash" to their own personal use. Mr. Fagin and Mrs. Goldstein also informed respondent's agent that Mr. Spill and Mrs. Koltun held out-of-state real property, as well as unreported business interests, and that Mr. and Mrs. Koltun had thrown a lavish bar mitzvah for their son. Before using the Beat Yesterday book to determine deficiencies for Filly's, respondent's agent *218 attempted to confirm the allegations made by Mr. Fagin and Mrs. Goldstein. The agent's investigation confirmed the allegations, which also are supported by the record. Customers were asked to make checks payable to "cash" when paying for merchandise at Filly's. At least some of those checks were endorsed by Mr. Spill and Mrs. Koltun and deposited in one or more personal checking accounts in Florida. Respondent discovered cancelled checks dated as early as January or May, 1977, and as late as various dates in 1979. None of the checks were deposited in either of two corporate bank accounts maintained by Filly's. Both Mr. Spill and Mrs. Koltun owned condominiums in Florida, as alleged by Mr. Fagin and Mrs. Goldstein. On June 7, 1977, Mr. Spill purchased a condominium at a development called "Century Village," while sometime around or during 1979, Mrs. Koltun purchased a condominium at another development, "Shaker Village." [3] Both purchases involved the assumption or creation of a mortgage. Mr. Spill rented out his condominium but failed to report the resulting rental income. *219 Mr. Spill and Mr. and Mrs. Koltun also held various unreported business interests. In 1978, Mrs. Koltun and others formed a company called "FAB Sales," and Mrs. Koltun invested $ 17,500 in the company. Five thousand dollars of the foregoing amount may have been a loan. Also in 1978, Mrs. Koltun invested $ 6,500 in a firm called "Intermaritime." In 1979, she invested $ 35,000 in a company called "Vantage Point Fashions." Also in 1979, Mr. Koltun invested roughly $ 25,000 in Amusements International, which operated a candy store in Atlanta, Georgia. The allegation that Mr. and Mrs. Koltun had thrown a lavish bar mitzvah for their son also proved true. Approximately $ 14,000 had been spent on the occasion. Some of the expense may have been defrayed by gifts. On his returns for the years in issue, Mr. Spill reported $ 18,350 of adjusted gross income in 1977 and $ 19,700 in 1978. Mr. and Mrs. Koltun reported $ 19,671 in 1977 and $ 26,325 in 1978. Confirmation of the diversion of checks, the out-of-state assets, the unreported business interests, and the bar mitzvah convinced respondent's agent that Mr. Fagin and Mrs. Goldstein were reliable informants who could be trusted *220 and that the Beat Yesterday book represented an authentic and accurate record of sales by Filly's. Thus, respondent's agent determined deficiencies for Filly's for its taxable years ending June 30, 1977, and June 30, 1978, by substituting the gross sales reported on the Beat Yesterday book for the gross sales reported by Filly's on its tax returns for those years. Respondent also determined deficiencies against Mr. Spill and Mr. and Mrs. Koltun, presuming that one half of the "unreported sales" were received by Mr. Spill and that the other one half were received by Mrs. Koltun. Respondent mailed statutory notices to Mr. Spill, Mr. and Mrs. Koltun, and Filly's on April 9, 1984. OPINION Respondent contends that Mr. Spill and Mrs. Koltun diverted corporate receipts in the form of cash and checks made payable to "cash" to their personal use and failed to report fully the amounts diverted. Respondent further asserts that the diversions by Mr. Spill and Mrs. Koltun resulted in an underreporting of gross sales by Filly's. Respondent contends that the Beat Yesterday book reflects the true gross sales of Filly's. Petitioners deny that cash or check receipts were diverted or that gross *221 sales were underreported. As a preliminary matter, we first must decide whether the statute of limitations bars assessments against petitioners. The three-year period of limitation set forth in section 6501(a), if applicable, would prevent assessment for all of the taxable years in issue for all of the petitioners. The six-year period of limitation set forth in section 6501(e), if applicable, would permit all of the assessments sought by respondent, except that for the taxable year of Filly's ending June 30, 1977. The unlimited period of limitation applicable when a "false or fraudulent return" has been filed (section 6501(c)) would, of course, permit all of the assessments sought by respondent. We first consider whether section 6501(c) applies. In order to invoke section 6501(c), respondent must prove, by clear and convincing evidence, that an underpayment exists and that at least a portion of the underpayment is attributable to fraud. Sec. 7454(a); Rule 142(b); Shaw v. Commissioner,27 T.C. 561, 569-570 (1956), affd. 252 F.2d 681 (6th Cir. 1958); *222 Kreps v. Commissioner,351 F.2d 1, 4 (2d Cir. 1965), affg. 42 T.C. 660 (1964). Essentially, respondent must make the same showing which justifies imposition of the addition to tax for fraud under section 6653(b). Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); McGee v. Commissioner,61 T.C. 249, 261 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). [4]
Fraud consists of the intent to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Rowlee v. Commissioner,80 T.C. 1111, 1233 (1983). Whether fraud exists is an issue of fact to be resolved by reference to the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud cannot be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). Fraud may be proved by circumstantial *223 evidence, however, because direct proof of a taxpayer's intent is seldom available. Rowlee v. Commissioner, supra at 1123. A taxpayer's entire course of conduct may establish fraud. Stone v. Commissioner,56 T.C. 213, 224 (1971). Respondent cannot, however, rely upon petitioners' failure to prove error in respondent's determinations. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982); Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Filly's is a corporation. Consequently, it can act only through its officers, employees, and agents, and the wrongful acts and intentions of its officers can be imputed to it. Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963); Ace Tool & Engineering, Inc. v. Commissioner,22 T.C. 833, 843 (1954). Based upon the entire record, we hold that respondent has established, by clear and convincing evidence, that petitioners fraudulently *224 underpaid their taxes for their respective taxable years in issue. A number of incriminating facts indicate the presence of fraud. First, customers of Filly's were told to make checks payable to "cash" when purchasing merchandise. Those checks were endorsed by Mr. Spill and Mrs. Koltun and deposited in one or more personal checking accounts in Florida. Petitioners' only explanation for the foregoing is that Filly's used a "cash payroll" and that if insufficient cash was available to meet payroll, the principals would take checks made payable to "cash" as part of their salaries. Petitioners' explanation, however, does not withstand scrutiny. For example, there is no logical reason why Mr. Spill or Mrs. Koltun would prefer checks made payable to "cash" over checks made payable to "Filly's" as salary. As officers of Filly's, Mr. Spill and Mrs. Koltun presumably had the authority to endorse checks made payable to "Filly's." Checks made payable to Filly's could have been converted easily to bearer paper (payable to the bearer of the check rather than a specific payee), like checks made payable to "cash," by endorsing them "in blank," i.e., without restriction. N.Y. U.C.C. Law secs. *225 3-111(c), 3-204(2) (McKinney 1964). Because petitioners have not explained why Mr. Spill and Mrs. Koltun could not or would not accept checks made payable to Filly's as salary, we reject petitioner's explanation that the cash payroll employed by Filly's required that customers make checks payable to "cash." Further, we do not deem it a coincidence that apparently all of the checks made payable to "cash" were deposited in one or more personal bank accounts and that none found their way into the corporate bank accounts of Filly's. We do not believe that all of the checks made payable to "cash" had to be used to satisfy the cash payroll, leaving none for deposit in the corporate bank accounts. Rather, the record discloses that at times Filly's had set aside so much cash for payroll and other cash expenditures that excess cash had to be deposited in the corporate bank accounts. Under that circumstance, checks made payable to "cash" also should have been deposited in the corporate bank accounts. Rather than coincidence, we find that the failure to deposit checks made payable to "cash" in the corporate bank accounts was part of petitioners' scheme to divert corporate income to the *226 corporate principals, thus avoiding tax at both the corporate and shareholder/employee levels. The fact that personal bank accounts were maintained in Florida, although both Mr. Spill and Mrs. Koltun lived in the state of New York, further confirms our conclusion. A second circumstance indicating fraud is petitioners' failure to keep a record of the salaries withdrawn by Mr. Spill and Mrs. Koltun from corporate receipts. Petitioners claim that the principals withdrew cash and checks made payable to "cash" from the sales receipts as salary and dutifully reported such withdrawals on their individual returns. Petitioners also aver that the withdrawals were added to the amounts deposited to the corporate bank accounts in computing the gross sales of Filly's. Yet, incredibly, Mr. Spill admitted at trial that no written record of such withdrawals was maintained and that, rather, he kept a record "in my head." Failure to maintain proper records evidences fraud. Truesdell v. Commissioner,89 T.C. 1280, 1302 (1987); Bradford v. Commissioner,796 F.2d 303, 307 (9th Cir. 1986), *227 affg. a Memorandum Opinion of this Court; Moore v. Commissioner,619 F.2d 619 (6th Cir. 1980), affg. a Memorandum Opinion of this Court. The failure to maintain a written record of withdrawals from sales receipts made it all too easy for Mr. Spill or Mrs. Koltun to "forget" withdrawals made and thus cause Filly's to underreport its gross sales and the principals to understate their salaries. In accepting Mr. Spill's admission that Filly's kept no record of withdrawals, we give him and the other petitioners the benefit of the doubt. If indeed a record was maintained and exists, but was disregarded in tax return preparation and not produced at trial, then fraud is even more apparent. Cf. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Further evidencing fraud are Mr. Spill's and Mrs. Koltun's unreported business interests and investments in real property in Florida. Between 1977 and 1979, Mr. and Mrs. Koltun invested some $ 84,000 in FAB Sales, Vantage Point Fashions, Amusements International, and Intermaritime. Further, both Mr. Spill and Mrs. Koltun purchased condominiums *228 in Florida during that time period, and at least one of the condominiums produced rental income for Mr. Spill, which he failed to report. Neither the business interests, the real property, nor the rent therefrom were disclosed on any of petitioner's returns or to respondent. Although these investments do not, by themselves, establish fraud on the part of any of the petitioners, they do corroborate what is indicated by the diversion of cash and checks to personal bank accounts in Florida, i.e., that not all corporate receipts were reported by Filly's and that Mr. Spill and Mrs. Koltun did not report the full extent of their withdrawals from the corporate receipts. Further, Bradford v. Commissioner, supra at 307, cites "concealing assets" as one of the "badges of fraud." Further, Mr. Koltun admitted that Mrs. Koltun held title to all property owned by the couple because there were outstanding, unsatisfied money judgments against Mr. Koltun, including one judgment in favor of the state of New York for unremitted sales taxes. Mr. Koltun also admitted that he has been jailed *229 for contempt in connection with New York's efforts to collect its judgment. While we applaud Mr. Koltun's candor, we view his efforts (and his wife's cooperation) at avoiding his legal obligations as further proof that Mr. and Mrs. Koltun intended to avoid their obligations to the Federal treasury. See McGee v. Commissioner, supra at 260. [5]
Finally, fraud is evidenced by the fact that petitioners kept a record of daily sales which they did not use in preparing their returns. A number of witnesses testified to the existence of a record of sales, specifically, Mrs. Goldstein, Iris Fishman, and Eugene Kazlow. We give less weight to the testimony of Mrs. Goldstein because of her obvious bias against petitioners. Mrs. Goldstein worked as a manager at Filly's for a number of years. Sometime in 1978, she, Mr. Fagin, and Mr. Kazlow began negotiating for the purchase of Filly's from Mr. Spill and Mrs. Koltun. After those negotiations terminated in failure, *230 Mrs. Goldstein left Filly's to start her own business. She did in fact open such a business with Mr. Fagin, Mr. Kazlow, and Ray Lemme, and the business, called "Sylvie's" competed with Filly's. The animosity between Mrs. Goldstein's group and petitioners became apparent when Mr. Fagin threatened to "bury" petitioners. Although we cannot be certain Mr. Fagin ever attempted to carry out his promise, in 1983, Filly's burned completely in a fire, and, after moving to a new location, the store was fire-bombed. [6]
Mrs. Fishman, a former bookkeeper for Filly's, left Filly's to work for Mrs. Goldstein and was Mrs. Goldstein's employee at the time of trial. Consequently, we likewise give less weight to her testimony. Mr. Kazlow, on the other hand, appeared to be an unbiased witness. Although he was a member of the "partnership" which *231 sought to purchase Filly's and later opened a competing store, Mr. Kazlow had a serious "falling out" with his partners, Mrs. Goldstein, Mr. Fagin, and Mr. Lemme, shortly after Sylvie's opened. In fact, he sued them, alleging various types of fraudulent behavior. We believe that Mr. Kazlow had no reason to fabricate testimony that would damage petitioners. Mr. Kazlow, an attorney, participated in negotiations for the purchase of Filly's and learned, during those negotiations, of the existence of a record of sales. He testified to this separate record of sales. Further, Mr. Kazlow's affidavit was admitted into evidence without objection, and in it Mr. Kazlow stated that sales were recorded in a "Beat Yesterday" book. We heard Mr. Kazlow's testimony, observed his demeanor on the witness stand, and have examined his testimony closely for any conflict. We find Mr. Kazlow to be a credible witness and believe he testified truthfully. Other circumstances point towards the existence of a record of sales which petitioners did not use in return preparation. First, although the Beat Yesterday book has been referred to as a "second set of books," it can more aptly be described as *232 the only record of sales by Filly's. The so-called "cash receipts journal" produced by petitioners is really a record of deposits into the corporate bank accounts. It does not reflect amounts withdrawn from each day's receipts in order to meet the cash payroll, or to purchase goods. [7] The journal apparently does not record credit card sales. Thus, unless petitioners maintained the Beat Yesterday book or some other record of daily sales, they kept no true record of "sales," as that term is commonly understood. Mr. Koltun testified to the existence of a red book in which he recorded such bits of information as the weather on a given day, although the book was not produced at trial. It simply is not plausible that petitioners bothered to record meteorological data and neglected to record sales, the benchmark of their store's performance. We note that respondent produced cancelled, diverted checks dated as early as the first half of 1977, proving that diversions took place *233 in each of the taxable years in issue. We note also that Mr. Spill endorsed some of the diverted checks and admitted that he and Mrs. Koltun withdrew the same amounts from corporate receipts. Mr. Koltun performed a number of duties for Filly's, including tallying daily receipts and making bank deposits. Because he performed these duties, Mr. Koltun must have known of the diversion scheme. Further, the fraud of Mr. Spill and Mrs. Koltun is imputed to Filly's. Federbush v. Commissioner,34 T.C. at 749. In sum, respondent has adduced clear and convincing evidence that all of the petitioners fraudulently understated their taxes for their respective taxable years in issue. Mr. Spill and Mrs. Koltun diverted corporate receipts, failed to keep a record of their withdrawals, and maintained a record of sales which was disregarded when preparing the corporate tax returns. We are convinced that petitioners harbored the "intent to evade tax." Because section 6501(c) applies, assessments against petitioners are not time-barred. Because respondent has met his burden of proof respecting *234 the limitation period, the burden is on petitioners to demonstrate that respondent's determinations are incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933); Shaw v. Commissioner,27 T.C. at 570. [8] Petitioners have failed to carry their burden. Petitioners argue that respondent's determinations are excessive because any unreported income was used to make cash purchases of merchandise. Petitioners have adduced a summary of invoices allegedly documenting such purchases. If petitioners' allegation is true, then respondent's increased gross sales figures would be offset in whole or in part by increased costs of goods sold figures for Filly's. Further, if the diverted cash was used to purchase merchandise, it would not constitute constructive dividends to Mr. Spill and Mrs. Koltun. See Herman v. Commissioner,84 T.C. 120, 134-135 (1985). We find that Filly's did make some cash purchases of merchandise that were not reflected in the cash disbursements journal and that, consequently, were not reported as part of the costs of goods sold for *235 the taxable years in issue. Those cash purchases were not sufficient in amount to offset the fraudulent diversions by the principals and do not affect our holding respecting fraudulent understatements by the petitioners. Yet, petitioner and respondent submitted a stipulated exhibit itemizing the cash purchases by Filly's, and those amounts designated as "allowed" by respondent should be taken into account in the Rule 155 computation which we will order. Petitioners also argue that if we find Filly's liable for deficiencies and additions, then those deficiencies and additions should reduce the constructive dividends imputed to Mr. Spill and Mrs. Koltun. Petitioners' argument, although unclear, suggests that the earnings and profits of Filly's for the taxable years in issue should be reduced to reflect its tax liability and that Mr. Spill and Mrs. Koltun should be charged with dividends totalling no more than those reduced figures. Petitioners' argument fails because dividends may be paid out of accumulated as well as current earnings and profits. Secs. 301(c)(2), 316(a). It was incumbent upon petitioners to prove that accumulated as well as current earnings and profits *236 were less than the diverted sums. Robin Haft Trust v. Commissioner,61 T.C. 398, 406 (1973); Lembeck v. Commissioner,16 B.T.A. 250, 252 (1929). They failed to do this. Petitioners' briefs also complain that respondent is "attempting to double tax the same income." Corporate income, however, is routinely taxed twice, once at of the corporate level (sec. 11(a)) and again at the shareholder level, when distributed (Sec. 301(c)(1)). If petitioners think that result is unjust, their remedy is to convert Filly's to subchapter S status or to operate as a partnership. In sum, except as provided herein, petitioners have failed to demonstrate that the deficiencies determined by respondent are incorrect. Consequently, we uphold those deficiencies. Rule 142(a); Welch v. Helvering, supra at 115. The same evidence which justifies application of the unlimited period of limitation set forth in section 6501(c) also justifies imposition of the section 6653(b) fraud additions determined by respondent. Estate of Temple v. Commissioner, supra at 159-160. To reflect the foregoing, Decisions will be entered under Rule *237 155.
Footnotes
1. Cases of the following petitioners have been consolidated herein: Philip Spill, docket No. 23115-84, Philip and Florence Koltun, docket No. 23116-84, and Filly's Fashions, Inc., docket No. 23117-84. Except as otherwise noted, for convenience we will refer to the foregoing consolidated cases collectively as "the instant case."↩
2. Unless otherwise indicated, all section and Code references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The record suggests that Mr. Spill and Mr. and Mrs. Koltun were "one big happy family" and that investments made by any one of the individual petitioners may have been made on behalf of all of them. Even if true, this circumstance would not affect the outcome of the instant case. We note the ambiguous ownership of various assets for the record.↩
4. McDowell v. Commissioner,T.C. Memo. 1987-186↩.
5. The full measure of Mr. Koltun's regard for the judicial process was revealed when the Court barred him from the courtroom because he was found using gestures to coach Mr. Spill when Mr. Spill was testifying.↩
6. After apparently borrowing money from loan sharks, Mr. Fagin himself was killed prior to trial in an automobile "accident." The record in the instant case brings to mind Hobbes' observation in Leviathan: "continual fear and danger of violent death; and the life of man, solitary, poor, nasty, brutish and short." Leviathan, pt. i, ch. 13 (1651).↩
7. Although Ms. Karo testified that the cash payroll was recorded in the cash receipts journal, Mr. Spill, as noted, admitted that no record was maintained of salary withdrawals by the principals.↩
8. Smith v. Commissioner,T.C. Memo. 1976-114↩.