T.C. Memo. 2008-195

UNITED STATES TAX COURT

MIGUEL AND TRINIDAD ROBLETO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MIGUEL ROBLETO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10945-06, 10946-06.[1]   Filed August 18, 2008.

<u>Jan Pierce</u>, Daniel Kleid (specially recognized), and

Darin Wisehart (specially recognized), for petitioner Miguel

Robleto.

Trinidad Robleto, pro se.

<u>Kelley A. Blaine</u>, for respondent.

---

[1] These cases have been consolidated for trial, briefing and
opinion.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  For 2000, 2001, and 2002 respondent determined deficiencies in petitioners' joint Federal income taxes, additions to tax, and fraud as follows:

| Year | Deficiency | Addition to tax Sec. 6651(a)(1) | Penalty Sec. 6663 |
|------|-----------|------------------------------|------------------|
| 2000 | $79,029 | $19,757 | $59,272 |
| 2001 | 231,209 | 57,508 | 172,551 |
| 2002 | 175,997 | --- | 131,998 |

Respondent also determined a deficiency in petitioner Miguel Robleto's (Miguel) 2003 individual Federal income tax, additions to tax, and a fraudulent failure to file as follows:

| Deficiency | Additions to Tax Sec. 6651(a)(2) | Sec. 6654 | Penalty Sec. 6651(f) |
|-----------|--------------------------------|-----------|--------------------|
| $211,139 | * | $5,849 | $153,075 |

* To be computed.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issues for decision involve the amount of gross receipts Miguel received each year in his business and whether the fraud penalties determined by respondent should be sustained against Miguel.  Additional issues for 2000, 2001, and 2002 relating to whether petitioner Trinidad Robleto should be charged

with any portion of the fraud penalties we sustain and whether petitioner Trinidad Robleto is entitled to relief from joint liability under section 6015(f) from joint liability for tax deficiencies, additions to tax, and penalties have been separated for trial and are not addressed herein. Consistently therewith, in this opinion we generally do not refer to petitioner Trinidad Robleto.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioners lived in Oregon.

From approximately 1988 until sometime in 1996 Miguel was employed by the Oregon Department of Motor Vehicles (DMV) as a counter clerk and as an administrator of written tests relating to safe driving laws and practices. Those tests are required to obtain Oregon drivers' licenses.

From 1996 until late 1999 Miguel had a number of jobs working for Home Depot and Goodwill Industries and in construction working with concrete. Miguel was not well educated, and until 2000 Miguel had not owned a business. Miguel was not familiar with accounting and bookkeeping, and he was not trained in business management.

Even though tests for Oregon drivers' licenses were administered by DMV without a fee or charge to applicants, in

2000 the Oregon DMV initiated a pilot program to allow approved third-party examiners to administer the required DMV written knowledge and behind-the-wheel driving tests and to charge fees for their services. This program was initiated on account of difficulties many Spanish-speaking individuals had in obtaining Oregon drivers' licenses. In particular delays often occurred at DMV in finding someone who could speak Spanish to explain the drivers' license application process and to administer in Spanish the written and the driving tests. It was the objective of DMV that through the pilot program and the additional Spanish language assistance which would be available through third-party examiners the number of immigrant Spanish-speaking individuals who would obtain Oregon drivers' licenses would greatly increase.

During the years involved, in order to obtain an Oregon driver's license applicants had to show proof of: (1) Their name; (2) their date of birth; (3) their Oregon residency; and (4) passing grades on the DMV written test and the behind-the-wheel 2.7-mile driving test. Applicants did not have to prove they were legal residents of the United States.

On January 20, 2000, Miguel was approved by DMV to own and to operate a business that would participate in the DMV pilot program. Miguel's business name was Drive Master Examiners (DME). In view of his employment background with the DMV and his

fluency in Spanish, Miguel viewed this pilot program as an excellent opportunity to establish his own business.

Miguel formed and operated DME as a sole proprietorship, and from early 2000 through 2003 DME was extremely profitable. Occasionally, busloads of migrant farm workers would arrive from Oregon fields to take the driving tests administered by DME.

Upon successful completion of the tests administered by DME, customers would take to DMV a written statement which DME had given them verifying that they had passed the written and the driving tests, and they would obtain their drivers' licenses.

During 2000 and the first 10 months of 2001 DME conducted the written tests and the driving tests. In late 2001 DMV required third-party examiners such as DME to stop offering the written tests. Thereafter through November of 2003 DME continued to offer the behind-the-wheel driving tests.

Generally, DME customers used their own automobiles to take the driving tests. However, where a DME customer did not have access to an automobile to use for the driving test, for an additional fee Miguel would allow the customer to rent from him the van he owned in 2000 and 2001 or the Toyota Camry he owned in 2002 and 2003.

In 2000 and 2001, because most DME customers did not want to use a large van to take their driving tests and because most DME

customers had their own vehicles, only about 10 percent of DME customers rented Miguel's van for the driving tests.

In 2002 and 2003, when Miguel owned the Toyota Camry, more DME customers were willing to rent Miguel's Camry to take their driving tests, and Miguel's rental of the Camry to customers for that purpose increased to approximately 25 percent of all customers who took the driving test in 2002 and to approximately 30 percent of all customers who took the driving test in 2003.

DME used two other individuals, Manuel and Hilda, to assist in conducting driving tests, and the fees received for their services were shared 50/50 with Miguel.

Under the DMV pilot program, in 2000, 2001, 2002, and 2003 DME conducted more than 27,000 written tests and driving tests for customers, and thousands of Spanish-speaking individuals obtained Oregon drivers' licenses through DME.

Monthly, DME was required to report to DMV the results of each written and each driving test administered and whether each customer passed or failed the test. The monthly reports DME submitted to DMV indicate that during 2000, 2001, 2002, and 2003 DME (through Miguel, Manuel, and Hilda) conducted a total of both the written and the driving test as follows:

| Name | Year and Number of Tests | | | |
|------|------|------|------|------|
| | 2000 | 2001 | 2002 | 2003 |
| Miguel | 2,895 | 5,859 | 4,016 | 4,666 |
| Manuel | 350 | 2,866 | 3,450 | 3,467 |
| Hilda | 74 | --- | --- | --- |
| Total tests | 3,319 | 8,725 | 7,466 | 8,133 |

Unfortunately, the monthly reports DME prepared and submitted to DMV were not required to and did not report the amounts of the fees DME received for administering the tests.

For a few months in 2003 petitioner Trinidad Robleto began giving, and charging a fee for, classroom instruction relating to safe driving laws and practices.  Each classroom session generally consisted of 10 to 12 students.

Also during the years before us, DME apparently offered for an additional fee some behind-the-wheel driver training, but the evidence does not indicate the extent thereof.

Miguel generally worked 6 days a week primarily administering driving tests.

As stated, the monthly logs submitted to DMV did not include the amounts of fees DME received in each year, and the evidence before us is somewhat conflicting and incomplete in that regard. Some evidence indicates that Miguel charged $25 for each driving test.  Other evidence indicates that he charged $36 or $40 for a driving test.  Some customers appeared to have been charged $80 for a driving test and a classroom session.  A few customers

appear to have been charged as much as $195, apparently for a combination of the services DME offered.

Occasionally Miguel offered discounts to customers who could not afford to pay the fees DME charged. Migrant workers and students under 21 years of age apparently were often given significant fee discounts.

Complicating our fact finding as to the amounts of fees and income Miguel received through DME is the fact that other than the logs submitted monthly to DMV Miguel did not maintain any regular books and records regarding DME. In particular, no records were maintained of fees charged, income earned, or expenses incurred in the business.

Also complicating our task is the fact that most of the fees DME charged its customers were received in cash. Miguel retained large amounts of cash throughout his home and in his automobile, and he deposited large amounts of cash into his bank accounts at three different banks. Miguel paid many expenses in cash.

Using records obtained from the banks, it is established that most of the bank deposits that Miguel made relating to fees collected by DME indicate that the fees DME received from customers generally were in the range of $25 to $40.

Some DME customers paid with checks, and approximately 1 to 2 percent of all deposits made into Miguel's bank accounts represented deposits of checks. Bank records relating to

petitioners' bank accounts reflect that most of the checks deposited into Miguel's bank accounts were in the amount of approximately $40.

A number of times during 2000, 2001, and 2002 the Oregon Depart of Transportation audited various third-party examiners who were participating in the program in which DME was participating and determined that the average third-party examiner was charging approximately $35 for a driving test and an additional $25 where the customer rented the examiner's automobile.

In 2002 Miguel used cash from DME to make a downpayment on and to purchase a parcel of real estate in Hillsboro, Oregon. Miguel purchased the property, but the title thereto was placed in Miguel's brother's name.

Miguel titled in his brother's name the van and the Camry that he purchased.

During the years in issue Miguel took his family on vacations to Italy, Hawaii, and Nicaragua.

From March 2000 to August 2003 Miguel withdrew from his bank accounts at Bank of America a total of $313,022.

At trial Miguel estimated that his best guess of the gross receipts of DME was between $249,000 and $436,800 a year.

As a side activity, Miguel prepared some tax returns for DME customers for a fee.

As stated, for each year in issue Miguel maintained no record-keeping system nor any records of the fees and of the cash he received in his business. Miguel kept essentially no records of the expenses incurred. Miguel did not use a cash register, and he did not provide receipts to his customers.

Into three separate bank accounts Miguel made a number of $10,000 cash deposits; and Miguel made a point of discussing with Bank officials his understanding that because the cash deposits were not over $10,000, no reporting of the deposits was needed.

In April 2003 Miguel and petitioner Trinidad Robleto untimely filed their 2000 and 2001 joint Federal income tax returns and Miguel timely filed his 2002 Federal income tax return; all three returns had been prepared by an accountant Miguel hired. The accountant prepared the tax returns in 2003 using incomplete and estimated information Miguel provided to him. Miguel provided the preparer with no business records of DME and told the preparer that the figures he (Miguel) provided were estimates of his income and expenses.

Miguel did not provide the accountant with a DME general ledger or other business records. Miguel did not provide the accountant with the number of driving tests conducted each year or the fees charged for the tests. Miguel did not disclose to the accountant the fact that he (Miguel) also prepared tax returns for a fee.

On the 2000, 2001, and 2002 Federal income tax returns Miguel reported gross receipts of $34,939, $58,080, and $80,860, respectively, or total gross receipts for all 3 years of only $173,879.

For 2003 Miguel has never filed a Federal income tax return. Generally, Miguel estimated expenses claimed on the tax returns from canceled checks written during the year.

In September 2003 officials of the Federal Office of Immigration & Customs Enforcement (Customs Enforcement) and Oregon law enforcement investigated Miguel on suspicion that Miguel was creating and selling false documents to his customers showing they were residents of Oregon. Search warrants were executed on petitioners individually and on petitioners' home, DME's office, bank accounts, and the Camry automobile. As a result of the search warrants, Customs Enforcement seized from Miguel a total of $898,629 in cash, computers, and the limited records that were found. The cash seized from Miguel was found in the following locations:

| Location | Amount |
| --- | --- |
| A safe in petitioners' home | $474,745 |
| 3 Bank of America accounts | 191,717 |
| 2 Wells Fargo accounts | 119,925 |
| 2 U.S. Bank accounts | 88,338 |
| Miguel's automobile | 13,000 |
| Miguel's wallet | 3,231 |
| Trinidad Robleto's purse | 2,500 |
| Floor of petitioners' home | 470 |
| Other | 4,703 |

The $898,629 in cash that was seized was money Miguel had received in his business. At the time of the seizures Miguel informed Customs Enforcement and/or Oregon law enforcement officials that he charged each of his customers a total of $80 if the customer took a driving test and rented his vehicle for the test ($40 for the driving test and $40 for the car rental).

As indicated, bank records relating to DME business activities and to Miguel's banking activities that were obtained during the seizure and through summonses served on the banks reflected that the amounts of most checks deposited into Miguel's bank accounts during the years in issue ranged from $25 to $46.

On September 20, 2004, Miguel was indicted in Oregon State court on various criminal counts relating to the operation of DME.

After a bench trial in November 2005, Miguel was acquitted of all charges brought against him. In the judgment of acquittal, the Oregon State court ordered that the $898,629 in cash seized from Miguel be returned to Miguel unless subject to a levy by respondent.

Immediately upon Miguel's acquittal, respondent initiated a jeopardy audit of petitioners' joint 2000, 2001, and 2002 Federal income tax returns and of Miguel's 2003 individual Federal income taxes.

As a result of the audit, respondent determined that Miguel underreported his gross receipts from DME on his 2000, 2001, and 2002 Federal income tax returns and that Miguel's income from DME for 2003 was substantial, requiring Miguel to file a 2003 Federal income tax return.

In calculating Miguel's income from DME and using the monthly logs which Miguel submitted monthly to DMV, respondent charged Miguel with $80 in income for each test listed on the monthly logs, even though respondent's revenue agent knew that Miguel had told Customs Enforcement that his fee was $40 per driving test and an additional $40 only if a customer rented Miguel's vehicle to take the test. On audit respondent did not attempt to estimate and did not charge Miguel with any additional fee income for car rentals, for behind-the-wheel driver training, for classroom instruction, and for tax return preparation.

On January 16, 2006, respondent made jeopardy assessments based on the above audit against petitioners relating to their 2000, 2001, 2002, and 2003 Federal income taxes in a total amount of over $1 million. Pursuant to a jeopardy levy that was executed, respondent seized the $898,629 being held by Customs Enforcement and applied it to the Federal income taxes, penalties, and interest assessed against petitioners.

During respondent's audit, Miguel did not cooperate with respondent.

Respondent determined that petitioners for 2000, 2001, and 2002 and Miguel for 2003 had total gross receipts from DME, unreported gross receipts, and tax deficiencies as follows:

| Year | Reported Sch C gross receipts | Redetermined gross receipts | Unreported gross receipts | Tax deficiency determined |
|------|-------------------------------|-----------------------------|---------------------------|---------------------------|
| 2000 | $34,939 | $265,520 | $230,581 | $79,029 |
| 2001 | 58,080 | 699,120 | 641,040 | 231,209 |
| 2002 | 80,860 | 597,280 | 516,420 | 175,997 |
| 2003 | --- | 650,640 | 650,640 | 211,139 |

On March 9, 2006, respondent mailed to petitioners the notice of deficiency for 2000, 2001, and 2002 and to Miguel the notice of deficiency for 2003 in which respondent determined the above tax deficiencies and the fraud penalties and additions to tax for each year.

With regard to the fraud penalties, respondent determined that all of the tax deficiencies for each year were attributable to fraud of both Miguel and petitioner Trinidad Robleto. Also, as an alternative to the fraud penalties for each year, respondent determined that petitioners for 2000, 2001, and 2002 and Miguel for 2003 were liable for the negligence additions to tax on the entire tax deficiency for each year.

Respondent also made a number of other computational adjustments to petitioners' reported expenses and deductions none of which is in dispute.

Respondent now acknowledges that on the basis of the trial evidence it would be appropriate to lower the amount of DME's fee

income to at least $46 per driving test in 2000, 2001, and 2002, not the $80 per test that respondent used for each year in the notices of deficiency.  However, on brief respondent stands on his determinations of DME's gross receipts and the tax deficiency determined for each year, which are based on the evidence that petitioner earned additional income from car rentals, from behind-the-wheel driver training, from classroom instruction, and from tax return preparation that was not included in any amount in respondent's income figures reflected in the notices of deficiency.

OPINION

Generally, as to the proper calculation of taxpayers' income, taxpayers bear the burden of proof, and the Commissioner's determinations are entitled to a presumption of correctness.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995).  The Commissioner's use of indirect methods to establish or to estimate a taxpayer's income may be imprecise, but errors do not necessarily render the computation arbitrary.  Marcello v. Commissioner, 380 F.2d 509 (5th Cir. 1967), affg. T.C. Memo. 1964-303 and T.C. Memo. 1964-304.[2]

_____

[2] Petitioners make no argument that they qualify for a shift in the burden of proof under sec. 7491(a).

Where the Commissioner asserts a civil tax fraud penalty, the Commissioner bears the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  As applicable to the instant case, to establish civil tax fraud respondent must prove that Miguel underreported his Federal income tax liability for each year and that the underreported tax, or a part thereof, was attributable to fraudulent intent on Miguel's part.

As to the other penalties and additions to tax at issue, under section 7491(c) respondent bears the burden of production.

## Miguel's Income

Under section 6001 taxpayers are required to maintain records that enable the Commissioner to determine the taxpayers' correct Federal income taxes.  If taxpayers do not maintain or provide the Commissioner with adequate records, the Commissioner may reconstruct their income using various methods of proof.  Sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965); McHan v. Commissioner, T.C. Memo. 2006-84.  One method the Commissioner may use to reconstruct a taxpayer's income is described as the unit method of proof.  See, e.g., Salami v. Commissioner, T.C. Memo. 1997-347; Maltese v. Commissioner, T.C. Memo. 1988-322; Stanoch v. Commissioner, T.C. Memo. 1959-132.  Under the unit method of proof, income is determined or estimated by multiplying

known prices for business transactions in which the taxpayer engaged by the number of business transactions.

For purposes of calculating Miguel's income from DME and his Federal income tax liabilities for the years in issue, the dispute centers primarily around the amounts of the fees DME charged its customers for the written and driving tests. As stated, in his notices of deficiency respondent simply multiplied the number of tests reflected in the logs DME submitted to DMV each year by $80. Miguel does not seriously dispute the number of tests reflected in respondent's calculations. Miguel contends, however, that all the evidence indicates that DME's fee was only $25 per test in 2000, $35 per test in 2001, and $40 per test in 2002 and 2003, and that only 10-35 percent of the customers paid Miguel an extra rental fee for use of Miguel's van or Camry.

Petitioners make additional arguments as to why the fees used in respondent's calculations of the tax deficiencies are overstated. Petitioners note that many customers (particularly migrant workers and students) received discounts from Miguel and paid no more than $25 per test and rarely a rental fee, that some customers at the time they took the tests did not have the full amount of cash for the fee that was due and never paid Miguel the balance, and that fees associated with the tests administered by

Miguel's assistants were split one-half with the assistants, resulting in Miguel's receiving only approximately $25 therefor.

Respondent makes additional arguments as to why the $80 per test used in his calculations of petitioners' income and tax deficiencies should be sustained even though the evidence is clear that $80 per test significantly overstates DME's fee in a large majority of the cases. Respondent notes that Miguel obviously had additional income not included in any amount in respondent's calculations (namely, income from the rental of Miguel's van or Camry, income from behind-the-wheel driver training, income from classroom instruction, and income from Miguel's tax return preparation activity). Respondent argues that even though we have no clue as to the amount of such additional income, the mere fact that Miguel concedes some such income justifies the $80-per-test amount used in respondent's deficiency calculations for each year.

The evidence is certainly unclear as to the amounts of the fees DME received from its customers. We summarize below some of the evidence relating just to the amounts of the fees DME charged customers and the apparent related service:

| Source of evidence | Nature of service | Fee |
|---|---|---|
| Miguel's statements before trial | Driving test | $40 |
| | Driving test & car rental | 80 |
| Miguel's trial testimony: | | |
|    For 2000 | Driving test | 25 |
| | Driving test & car rental | 50 |
|    For 2001 | Driving test | 35 |
| | Driving test & car rental | 70 |
|    For 2002-2003 | Driving test | 40 |
| | Driving test & car rental | 80 |
|    Migrant workers | Driving test & car rental | 25 |
|    Students under 21 | Driving test | 25 |
| | Driving test & car rental | 50 |
| Trial witness | Written & driving tests | 25 |
| DME May 2003 advertisement | Driving test | 40 |
| | Under-21 driving test | 25 |
| Most bank deposits | Written & driving tests | 25-46 |

We note other evidentiary problems in establishing the fees DME received. Some customers who took the tests did not pay for them. Some customers wrote checks for the tests but their checks bounced, and DME never was paid. Miguel occasionally offered customers special discounts based on, for example, inability to pay.

Without records, we certainly are disadvantaged in our effort to calculate petitioners' correct income for the years before us with any precision and confidence. We think it significant, however, that respondent's revenue agent

acknowledged at trial that on the basis of the trial evidence a fee closer to $40 per test would be more appropriate than the $80 used for each year in respondent's notices of deficiency.

On brief Miguel recomputes for 2000, 2001, and 2002, and he computes for 2003, his income for each of the 4 years in issue. Over the 4-year period, Miguel computes a total cumulative gross income of $1,041,722, which reflects and acknowledges a 4-year understatement of gross receipts of over $860,000.  We largely agree with Miguel's revised computations.  They are largely consistent with the credible evidence.  Rather than respondent's approach of sticking with the erroneous $80-per-test figure in lieu of using reasonably accurate per-test fee amounts and making estimates based on the evidence of other income, Miguel's recomputations make reasonable estimates of fee income from car rentals and classroom instruction.

In summary, Miguel now calculates and the evidence indicates, and we so find, that in 2000, 2001, 2002, and 2003 Miguel received gross receipts from written and driving tests he administered and a share of the gross receipts from tests administered by Manuel and Hilda and fees for car rentals in the following amounts and calculated as follows:[3]

---

[3] We do not charge Miguel with $163,370 in estimated fee income relating to classroom instruction provided by petitioner Trinidad Robleto in 2003.  For 2003 petitioners did not file a joint Federal income tax return, and the evidence is inadequate

(continued...)

Miguel's test fees and rentals:

|  | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| No. of written tests | $1,102 | $4,375 | --- | --- |
| Rate @ | 25 | 25 | --- | --- |
| Receipts | 27,550 | 109,375 | --- | --- |
| No. of driving tests | 1,793 | 1,484 | $4,016 | $ 4,666 |
| Rate @ | 32 | 35 | 40 | 40 |
| Receipts | 57,376 | 51,940 | 160,640 | 186,640 |
| No. of car rentals 10% | 179 | 148 | --- | --- |
| Rate @ | 32 | 35 | --- | --- |
| Receipts | 5,728 | 5,180 | --- | --- |
| No. of car rentals 25% | --- | --- | 1,004 | --- |
| Rate @ | --- | --- | 40 | --- |
| Receipts | --- | --- | 40,160 | --- |
| No. of car rentals 30% | --- | --- | --- | 1,400 |
| Rate @ |  |  |  | 40 |
| Receipts | --- | --- | --- | 56,000 |
| Total gross receipts | $90,654 | $166,495 | $200,800 | $242,640 |

Miguel's share of Manuel & Hilda's test fees:

|  | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| No. of Manuel's tests | $350 | $2,866 | $3,450 | $3,467 |
| Rate @ | 32 | 34 | 40 | 40 |
| Receipts | 11,200 | 97,444 | 138,000 | 138,680 |
| Miguel's ½ share | 5,184* | 45,067* | 63,820* | 64,140* |
| No. of Hilda's tests | $74 | --- | --- | --- |
| Rate @ | 32 | --- | --- | --- |
| Receipts | 2,368 | --- | --- | --- |
| Miguel's ½ share | 1,184 | --- | --- | --- |

* Discounted by approximately 7 percent for nonpaying customers.

In a more summary format, the total fees to be charged to Miguel in each year are as follows:

---

[3](...continued)
to charge any portion of petitioner Trinidad Robleto's estimated total fees for classroom instruction to Miguel.

| Source | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Knowledge tests | $27,550 | $109,375 | --- | --- |
| Driving tests | 57,376 | 55,448 | $200,800 | $242,640 |
| Miguel's share of Hilda's fees | 1,184 | --- | --- | --- |
| Miguel's share of Manuel's fees | 5,728 | 45,067 | 63,820 | 64,140 |
| Total gross fees | $97,022 | $209,890 | $264,620 | $306,780 |

For 2000, 2001, and 2002 respondent made only computational adjustments to petitioners' reported expense deductions and exemptions, and any dispute with regard thereto will be addressed in the Rule 155 computations.  For 2003 Miguel claims $46,533 in current business expenses and $3,300 in depreciation on the Toyota Camry he purchased in 2001 for $16,500.  At trial respondent did not challenge these claimed expenses for 2003, and we allow them.

Fraud Penalties

Fraudulent intent is defined as "'actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing.'"  Estate of Temple v. Commissioner, 67 T.C. 143, 159 (1976) (quoting Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939)).  Whether respondent has established Miguel's fraudulent intent is to be analyzed on the basis of all of the facts and circumstances in evidence.  See Stratton v. Commissioner, 54 T.C. 255, 284 (1970).

Fraud is never to be imputed or presumed.  However, "its proof may depend to some extent upon circumstantial evidence, and

may rest upon reasonable inferences properly drawn from the evidence of record." Stone v. Commissioner, 56 T.C. 213, 224 (1971); see also Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

Courts have developed several objective "badges" of fraud, including: (1) Dealing in cash; (2) inadequate records; (3) concealment of assets; (4) understatement of income; and (5) failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

Miguel concedes and we have concluded that for 2000, 2001, and 2002 Miguel substantially underreported his income and his taxes and that he earned substantial income in 2003 and was required to file a 2003 Federal income tax return. Thus, with regard to the fraud, we need only decide whether Miguel's underreporting for 2000, 2001, and 2002 and nonfiling for 2003 were due to fraudulent intent.

Miguel argues that he was overwhelmed by all the customers he had, that he was totally inept in handling the financial aspects of his business, that he could not even pay his utility bills on time, that he had unopened envelopes of cash lying around his home and office, and that the preparation and filing of his and his wife's 2000, 2001, and 2002 joint Federal income

tax returns surely constituted negligence, perhaps even gross negligence, but not fraud. For 2003 Miguel contends that because of the seizure of his records in the fall of 2003, he had no records or other information with which he could file his 2003 Federal income tax return, and he did not get the records back until sometime in 2006.

The evidence as to badges of fraud in this case are strong-- substantial unreported income, inadequate books and records, concealment of ownership of assets, cash transactions, and cash hoarding.

Dealing in large amounts of cash and not keeping any records thereof often go hand in hand with intentional underreporting of income and taxes. Noteworthy are Miguel's placement of assets in nominee names and Miguel's lack of cooperation.

Miguel's cash on hand, assets purchased, and vacations taken are not consistent with total gross receipts reported on the 2000, 2001, and 2002 tax returns of only $173,879. Cash of $898,629 was seized from petitioners in the fall of 2003. Petitioners' Bank of America accounts show disbursements of $313,022. These available funds of over $1.2 million are approximately $1.1 million more than the gross receipts reported on petitioners' tax returns for 4 years before us.

We emphasize that even using petitioners' and our

recalculation of Miguel's income, for the 4-year period a cumulative understatement is reflected of over $860,000.

Miguel relies on Westby v. Commissioner, T.C. Memo. 2004-179, in which the taxpayer maintained extensive records of income and expenses and cooperated in the Commissioner's audit for the years in issue and in which the Commissioner had not conducted a comprehensive audit. Westby provides no support to Miguel.

Miguel emphasizes how busy he was, that he could not be bothered with record keeping and taxes.

Respondent emphasizes that Miguel himself was a tax return preparer and that he hired an accountant to prepare his tax returns for 2000, 2001, and 2002 but knowingly failed to provide the preparer with adequate records to prepare accurate returns. Respondent adds that over a 4-year period Miguel failed to maintain records of business income, appears to have structured bank deposits to avoid cash reporting requirements, and Miguel used nominee names in purchasing property to hide his ownership of the properties from tax and other law enforcement authorities.

For the reasons stated by respondent, we sustain respondent's determination against Miguel of the fraud penalties for 2000, 2001, 2002, and 2003, and we conclude that the fraud penalties apply to the entire tax deficiency for each year that we sustain herein.

With regard to 2003, the evidence is clear and convincing that Miguel's failure to file for 2003 was caused by the same fraudulent intent that caused him to file erroneous 2000, 2001, and 2002 Federal income tax returns.

Section 6651(a)(1) and (2) and Section 6654 Additions to Tax

Miguel makes no specific arguments contesting the above additions to tax, and we sustain each of them.  See Funk v. Commissioner, 123 T.C. 213, 217-218 (2004).

Decisions will be entered under Rule 155.