T.C. Memo. 2013-21

UNITED STATES TAX COURT

OWEN G. FIORE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12790-07.                    Filed January 17, 2013.

Owen G. Fiore, pro se.

<u>Andrew R. Moore</u>, <u>John M. Wall</u>, and <u>Michael Skeen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Owen Fiore was a tax lawyer with a small but prominent practice.  He went to prison for evasion of his 1999 taxes--he admitted to fraud--but the Commissioner now claims he can prove Fiore filed fraudulent 1996 and

[*2] 1997 returns.  The parties agree on the deficiencies and dispute only the existence of fraud.

FINDINGS OF FACT

A.    Fiore's Rise in the Legal Profession

Fiore graduated from Loyola University of Los Angeles (now Loyola Marymount University) in June 1956 with an accounting degree.  He enrolled in the University's law school that summer.  After a short stint preparing income tax returns at Ernst & Ernst (now Ernst & Young), he was ordered to active duty with the U.S. Air Force in fall 1956.  He trained to be an auditor in Texas, and then returned to Los Angeles to work for the Air Force Auditor General and worked there until he finished law school in 1961.

Fiore started his legal career at the Los Angeles firm of Kindel & Anderson in 1961.  The firm elected him to partnership in 1966, and his practice came to focus on estate planning.  He moved to another L.A. firm--Agnew, Miller & Carlson--in 1969 and remained there until 1982, when he moved to Northern California and joined Hopkins, Mitchell & Carley.  In 1987 he formed a new law partnership with Robert Hales.  As he moved from firm to firm, his clients followed.  He became well known in his field, and as the decades flowed by he gained national prominence, speaking at numerous conferences across the country

[*3] and, more importantly to his partners, he made it rain--bringing in substantial business for every firm he worked for. He rarely appeared at the office, and his days were a whirl of client meetings and conferences. Administrative details and accounting were someone else's problem--that is, until he dissolved his partnership with Hales to form a solo practice in 1988. He hired Pat Sadler as his legal secretary. Fiore describes her as "my gal Friday"--a loyal, long-term employee who did her best to administer the firm effectively. She answered the phone, opened the mail, made appointments with Fiore's clients, took dictation and--this will be important--made bank deposits. She did not, however, have the time or expertise to handle the firm's accounting. She also wasn't much of a "computer person" and failed to take advantage of the software that could improve firm recordkeeping. But the new firm prospered, and Fiore hired two associate attorneys--John Ramsbacher and Leslie Daniels.

B.    Accounting at the Fiore Law Group

Fiore himself took on the responsibility for his firm's accounting. But he neglected that responsibility, choosing at every opportunity to focus on client development, marketing, and the sophisticated pleasure of solving his clients' complex problems.

**[*4]**   His sophistication did not extend to his management of the firm's finances. Fiore came to rely on a three-checkbook method of accounting--one for the general account, one for the client trust fund,[1] and one for minor expenses such as filing fees.  The preponderant flow of dollars was thus through the general account.  Client billings went into the general account; payroll, office rent, and the firm's other expenses came out of that account.  Fiore even handled payroll in a way that would have been familiar to lawyers of a hundred years before--writing out checks to each associate and employee by hand on paydays.  At the end of each year, he would write out a W-2 for each employee by hand.

Fiore gave only himself access to the general account.  Only he was allowed to open the general-account bank statements, even though he often failed to do so. (We find this otherwise unbelievable finding true because the IRS revenue agent conducting the audit of Fiore's returns received several unopened bank statements in response to his request for documents.)

---

[1] California law requires that attorneys maintain a client trust-fund account. Retainers remain in the account until earned.  Any interest earned is taken by the State to pay for legal services to the indigent.  Cal. Bus. & Prof. Code sec. 6211 (West 2003 & 2013 Supp.).  Because Fiore rarely obtained retainers--he preferred to bill clients after work was complete--the client trust fund had very little money in it.

**[*5]** Fiore did use legal billing software known as the Tussman Program. The Tussman Program can track billable hours, generate bills, and produce financial reports--but Fiore failed to use all, or even much, of its potential. Fiore and his associates did enter their billable hours into the program, and Sadler did print out computer-generated bills to send to clients each month. But Fiore adjusted the computer-generated bills--sometimes billing more and sometimes less--before sending them out. He took the time to write a letter with each bill to explain what work was done; he didn't take the time to update the program's database to reflect what was actually billed after adjustments. This meant that the firm's computer records did not reflect the amounts actually billed to clients. But it was the program's financial-reporting feature that was left most spectacularly underused. Bills were mailed out to the clients, and the clients would send checks to Fiore. Sadler would then deposit the checks into the general account. But she kept track of the deposits in a WordPerfect document on her computer--listing the client name, client number, and amount of payment. She would then put a copy of the bill and deposit slip in a three-ring binder, organized alphabetically by client. Each year, she or another employee would set up a new three-ring binder, often with the help of temporary file clerks. Sadler never used the binders to add up the

[*6] annual fees and never used them for financial reports with the Tussman Program--she didn't know how.

And she never added up the annual deposits from the general-account bank statements.

C.     The Road to Prison

By the end of the century, Fiore's practice was flourishing. But in 1995 his personal expenses started to swell: He paid $150,000 to settle a malpractice claim, and $85,000 in cash for a cabin in Idaho. (He was still a resident of Idaho when he filed his Tax Court petition years later.) He sold his principal residence in Portola Valley that same year and moved to a home he owned in Sea Ranch--150 miles from the San Jose office. He had a mortgage, and of course a tax bill for that house, but instead of enduring epic commutes every day, he rented an apartment closer to his office for more than $2,000 a month. And flashing on the horizon was the prospect of retirement.

The storm broke in 1996, when the Commissioner began an audit of Fiore's 1993-95 tax returns. Revenue Agent Lila Wong--a relatively recent IRS hire-- asked Fiore for an appointment in June 1996; the meeting didn't happen until October. Fiore brought only handwritten deposit records to that first meeting. Wong asked Fiore to try again, and this time to bring bank records and

[*7] substantiation for his business expenses. Fiore brought only payroll records and a calendar, but no bank records or other documents to substantiate income and expenses. Wong was new, but not newborn, and pressed Fiore again and again. Fiore promised to get his bank statements together and reconstruct his business expenses by January 1997, but ended up canceling that meeting--he said he had hired a CPA to handle the audit. But he never provided any power of attorney to Agent Wong, so she couldn't discuss the audit with anyone other than Fiore. She wanted to move the audit along, but here her inexperience showed, and she skipped a critical step for an audit like this one: She did not try to verify Fiore's income. She did not conduct (or arrange for) a bank-deposits analysis, but closed the audit after denying the business-expense deductions for lack of substantiation. The Commissioner sent Fiore a notice of deficiency for more than $1.2 million in September 1997. Fiore settled in 1999 for roughly $200,000.

Fiore did not let the audit swamp him. He continued to bring in clients, and he began buying up Idaho real estate. He bought five lots near his cabin for $100,000 cash in 1997. He bought a log house for $200,000 and built a $150,000 barn--with $75,000 down and financing for the rest--in 1998. He wrote--tellingly--in a letter asking for a loan that his firm "generates over 1.5 million in legal fees each year." We can also be sure he had a reasonable notion of his income from

[*8] other evidence, especially his talks in 1999 with Ramsbacher--one of the associates he had hired--when he decided to promote the younger man to partner. In early 1999 Fiore laid out discussion points for the proposed partnership in a memo. He wrote that "we will continue to be able to develop monthly fees in excess of $100,000 per month (1998 results, over $1.5 million in gross receipts)." He emphasized his plans to transition to a "less active role in the firm" by 2002. To back up his firm-income estimates, Fiore had a staff member produce a Tussman-generated report for Ramsbacher's review in January 1999. The report showed over $1.5 million in income for 1998. In the course of the partnership discussions, Ramsbacher expressed his concerns about the shipwreck that was the firm's bookkeeping. Fiore agreed to allow Ramsbacher to clean it up if he were made partner.

In July 1999 Ramsbacher and Fiore agreed to form a partnership. Ramsbacher took immediate steps to put the firm's affairs in order. He started out by hiring Paychex to handle payroll. Then he tried to use Quickbooks for firm accounting, only to discover that he wasn't a "computer person" either. But he at least recognized his shortcoming and hired someone to run Quickbooks for the firm. He also dealt with any staff issues and oversaw the day-to-day management

[*9] of the firm. This arrangement actually seemed to work. It allowed Fiore to do what he did best--bring in the business--while Ramsbacher took care of the rest.

The firm looked steady, but Fiore had not tied down his administrative problems after his first close call with the IRS. In the years immediately before Ramsbacher took over the accounting--1996 through 1999--Fiore did not report all his taxable income on his returns:

|  | Actual income | Reported income | Unreported income |
|---|---|---|---|
| 1996 | $476,923 | 197,225 | 279,698 |
| 1997 | 572,291 | 215,750 | 356,541 |
| 1998 | 534,851 | 192,069 | 342,782 |
| 1999 | 572,108 | 57,442 | 514,666 |

This time the IRS caught on. Verna Scott was the revenue agent that the Commissioner assigned to audit Fiore's 1998 return. She had years of experience in bookkeeping and business before going to the IRS, and with her more experienced eye immediately spotted something unusual about Fiore's return: His reported expenses were mostly rounded to the nearest hundred. She wrote Fiore to ask for his 1997 and 1999 returns, and for the firm's payroll reports, bank statements, books and records, and substantiation for business expenses. She set a

**[\*10]** date for their first meeting and gave Fiore a deadline to call if he needed to reschedule. Fiore hewed to the same tack he had in the earlier audit, and said he needed to reschedule. He explained that he was in Idaho and would call her back in mid-July when he returned to his office in California. He never called Scott back, so she called his office in late July to learn that he had been in the office earlier that month, but had returned to Idaho. She was persistent, and asked the firm to call him in Idaho and tell him to call her. Fiore did call her, but said he didn't know when they could meet, but that he would send documents by August 15. He instead sent her--after August 15--his 1997 and 1999 returns, the firm's 1998 payroll reports, and a handwritten list of checks. He did not send the other documents she had asked for and that he had promised to give.

Scott tried again. She set a meeting for September 22 and asked him again to bring the rest of the documents. Fiore brought 1998 bank statements for the general law-firm account--except for July's. Scott did a bank-deposits analysis and discovered that the deposits were "quite a bit higher" than the reported income, even using only 11 months of statements. When asked why this was the case, Fiore was less than forthright. He claimed that the excess deposits were attributable to transfers and nontaxable deposits. They weren't. Scott then asked Fiore how he calculated his law-firm income, and he replied that he used a

[*11] spreadsheet--which he never provided. As for business expenses, the handwritten check register Fiore provided previously didn't match most of his expenses. He brought an Amex year-end summary to the meeting, but it didn't have enough information for Scott to verify the deductibility of the expenses he claimed.

Fiore had sailed into a maelstrom. Scott scheduled another meeting for October 5. Fiore asked to reschedule. Scott agreed. Fiore called to reschedule for October 30, and then called to reschedule again. Scott issued a summons for Fiore's bank records. She got them and determined that Fiore had failed to report over $300,000 in income for 1998. She told him of her findings and opened an audit of his 1999 tax year. Out went an information document request for 1999. Fiore didn't respond. Out went a summons for his 1999 bank records. In came a bank-deposits analysis, and Scott again discovered a substantial amount of unreported income.

This was too much. Scott decided to refer the case to the Criminal Investigation Division of the IRS to determine whether there was fraud. Special Agent Lisa Sasso took over the investigation. She started by requesting copies of Fiore's 1996 and 1997 tax returns from IRS Service Center--but they were missing the Schedules C. Unlike the civil agents, Sasso didn't ask for meetings--she just

[*12] showed up unannounced at Fiore's office in March 2002. She read Fiore his rights and asked him questions about his billing procedures, books and records, and business expenses. After her initial visit, she requested documents for the 1996 and 1997 tax years. Fiore sent her some documentation, but didn't cough up any work papers to tie his information to his return. So Sasso sent a summons to Fiore's bank and then she did a bank-deposits analysis for 1996 and 1997. She determined that he had failed to report taxable income for those years, but chose to exclude Fiore's possible inflation of his business expenses from her case against him. She explained:

> [I]t's a lot more difficult to prove in a criminal case expense items on the tax return, especially if the taxpayer doesn't know or have books and records to show where he determined the numbers came from. So what I would have had to do is recreate all his books and records in order to determine the numbers on the tax return. * * * So I was trying to find specific expenses and show [a] pattern. But it was too difficult to do that for a criminal case and the burden of proof, so we just went with the income.

The bottom was now in sight. In November 2003, a grand jury indicted Fiore on four counts of tax evasion, one for each year from 1996 through 1999. He pled guilty only to the count arising from the 1999 tax year--and admitted to "knowingly and willfully understat[ing] the business receipts" for that year. In exchange, the government dropped the charges for 1996-98. He agreed, however,

**[*13]** that the 1996-98 understatements were "relevant conduct" for the purposes of sentencing. He also agreed to pay restitution for the underpayments from 1996-99. On the other hand, in his plea agreement he preserved his right to contest civil IRS penalties:

> Though I have agreed to an amount of restitution and tax loss amount as part of the agreed-upon disposition of this case, I agree that this agreement with respect to restitution and tax loss amount does not bar the Internal Revenue Service from making a civil determination with respect to additional taxes, interest and penalties for which I may be liable, nor will it bar me from civilly contesting any liabilities as determined by the Internal Revenue Service including asserting the statute of limitations as a bar to liability.

At his 2005 sentencing hearing, Fiore emphasized that his 1999 guilty plea didn't apply to 1996-98:

> I recognize that I brought this on myself relating to one year, 1999. I deny strongly as I can in this situation that the prior years, other than being relevant conduct for purposes of determining apparently the so-called tax loss, which I've fully paid, that the prior years have anything to do with or anywhere near the same conduct that I pled guilty to.

Fiore was sentenced to 18 months in the federal prison at Lompoc, California. He was released in October 2006. He is no longer a member of the bar.

D.  <u>Civil Penalties</u>

After closing out the criminal case, the IRS got back to work on Fiore's civil tax liability. Scott had never opened an examination of the years at issue in

[*14] this case--1996 and 1997. She thought that she couldn't open the 1996 tax year because the statute of limitations had expired. And by the time she got through the 1998 audit, she thought that she would have trouble completing an audit of the 1997 tax year before the statute of limitations expired for it as well. After consulting with her manager, she decided not to audit the 1997 return. But Fiore's guilty plea made the Commissioner think he had a way back to those years. Revenue Agent Charles Tonna helped put together the notice of deficiency. He explained at trial:

> Well, primarily, of course, was the fact that Mr. Fiore had actually pled guilty to tax evasion in regards to the last year, 1999, and I reviewed, of course, his plea agreement, which gave details on what he admitted as to how he had committed that crime, and since the facts were pretty much the same in the earlier three years, I relied partially on the plea agreement to establish that he had the same fact pattern in the first three years as well. * * * [T]he plea agreement was the primary or the most important factor in determining that fraud applied.

In addition to tax evasion in a year not at issue, he looked to the loan application disclosing $1.5 million in annual receipts from 1998. And he cited the 1993-95 deficiencies, Fiore's pattern of underreporting income, and Fiore's perhaps intentional failure to use his computer program's full capabilities as other factors showing fraud.

**[*15]** Tonna mailed out a notice of deficiency in March 2007. It determined deficiencies in tax and the fraud penalty for 1996-99. During pretrial preparation Fiore conceded the underpayments for all four years and the fraud penalty for 1998 and 1999. But he contests the fraud penalty for 1996 and 1997.

OPINION

Section 6663[2] imposes a penalty equal to 75% of an underpayment that is attributable to fraud. The Commissioner has the burden of proving fraud, and he can meet it only with clear and convincing evidence that the taxpayer underpaid and that the underpayment was attributable to fraud. Sec. 7454(a); Tax Court Rule 142(b). If the Commissioner succeeds in proving that even part of the underpayment is due to fraud, "the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud." Sec. 6663(b). Fraud also extends the statute of limitations on assessment indefinitely. Sec. 6501(c)(1).

Fraud is the "willful attempt to evade tax," and we make that determination by looking at the entire record of a case. Beaver v. Commissioner, 55 T.C. 85, 92

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

**[\*16]** (1970).  Did Fiore commit tax fraud in 1996 and 1997?  Or, more precisely,

did the Commissioner establish by clear and convincing evidence that Fiore willfully

attempted to evade tax in 1996 and 1997?  There are many factors which can

indicate fraud, including:

> • understatement of income,
>
> • inadequate records,
>
> • concealing assets,
>
> • failure to cooperate with tax authorities,
>
> • mischaracterizing the source of income, and
>
> • implausible or inconsistent explanations of behavior.

See Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner,

796 F.2d 303, 307-08 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Meier v.

Commissioner, 91 T.C. 273, 297-98 (1988).  We won't find fraud where the

circumstances merely lead to a suspicion of fraud.  Parks v. Commissioner, 94 T.C.

654, 664 (1990).  But we may use circumstantial evidence--including Fiore's entire

course of conduct.  See id.

With these background principles in mind, we look at the factors that the

Commissioner and Fiore point us to.

**[*17]** <u>Education and business knowledge</u>

One of the most important, if only because it floats over everything else, is that Fiore was, until his conviction, a highly respected tax attorney. And he was a highly respected tax attorney with a solid accounting background as well.

<u>Failure to keep adequate books and records</u>

This is especially important here, because Fiore's main defense is that he was a horrible recordkeeper. The three-checkbook method of accounting, handwritten employee paychecks, and other misuse of 1970s-era technology clearly show a failure to keep adequate books and records. And we have often cited bad recordkeeping as a factor in favor of finding fraud. <u>See, e.g.</u>, <u>Robleto v. Commissioner</u>, T.C. Memo. 2008-195, 2008 WL 3833661, at *10, <u>aff'd</u>, 471 Fed. Appx. 576 (9th Cir. 2012); <u>Kim v. Commissioner</u>, T.C. Memo. 2000-83, 2000 WL 267777, at *6; <u>Lee v. Commissioner</u>, T.C. Memo. 1995-597, 1995 WL 750122, at *8. But maybe something else was going on here. Sadler credibly testified regarding Fiore's hectic-yet-successful attempts at client development. And Fiore was accustomed to relying on the support of larger law firms and their well-organized accounting departments.

**[\*18]** <u>Failure to cooperate with tax authorities</u>

If the Commissioner had only chaotic books to offset Fiore's expertise, we would not find clear and convincing evidence of fraudulent intent. But the proof of how Fiore reacted to the civil audits advances the Commissioner's case. Fiore was a master of delay during the audits and the criminal investigation, repeatedly rescheduling meetings and giving up documents only grudgingly or not at all. He offered implausible explanations about nontaxable deposits and transfers into his general account. Still, he was constantly traveling to develop business, to set up his Idaho retirement, and to advise his clients. He shouldn't have canceled so many meetings with the IRS, but--though it edges the Commissioner closer to proof of fraud here--it's not quite clear and convincing given Fiore's consistency in poor recordkeeping.

<u>Pattern of consistent underreporting</u>

This case is about fraud for two years--1996 and 1997. Much of the Commissioner's case is built upon Fiore's behavior in years other than 1996 or 1997. But a pattern of underreporting in years not at issue does tend to show fraud. <u>See</u> <u>Ferguson v. Commissioner</u>, T.C. Memo. 2004-90, 2004 WL 605224, at \*15; <u>Plunkett v. Commissioner</u>, T.C. Memo. 1970-274, 1970 Tax Ct. Memo LEXIS 83, at \*25, <u>aff'd</u>, 465 F.2d 299 (7th Cir. 1972). The Commissioner

[*19] specifically identifies the 1993-95 deficiencies as the start of the pattern of noncompliance. But there's a problem with this argument--the 1993-95 deficiencies were based only on inflated expenses;[3] the 1996 and 1997 deficiencies were based only on unreported income.[4] So while there's some ground for suspicion of fraud, there wasn't much of a pattern yet--Fiore wasn't alerted to the possibility of unreported income by the earlier deficiencies, because only disallowed expenses were at issue. And unlike 1993-95, no expenses were disallowed for 1996-97.

Fiore's underreporting of his income gained momentum in 1998. The amount of the deficiency increased and there was written evidence of Fiore's knowledge of actual receipts--the loan application and the Tussman printout for partnership negotiations. And Fiore admitted in a plea agreement to criminal tax evasion for the 1999 tax year. The Commissioner points to Fiore's plea agreement as an admission of fraud for 1996 and 1997. See, e.g., Marretta v. Commissioner,

---

[3] The lack of unreported income from 1993-95 may be due to Agent Wong's oversight--she failed to perform a bank-deposits analysis. But it's the Commissioner's burden here, and we decline to make any finding that Fiore had unreported income in 1993-95 when the IRS didn't look for it.

[4] As explained in the facts section, the 1996 and 1997 tax years were never subjected to full audit because of IRS oversight, so there may have been improper expenses here as well. But we won't draw inferences in favor of finding fraud when it's the Commissioner's burden.

**[\*20]** T.C. Memo. 2004-128, 2004 WL 1172873, at \*4, aff'd, 168 Fed. Appx. 528 (3d Cir. 2006); Ferguson, 2004 WL 605224, at \*16; Price v. Commissioner, T.C. Memo. 1996-204, 1996 WL 204504, at \*5. In those cases, however the taxpayers got indicted for tax evasion for several years, agreed to plead guilty for the last year, and then got the other years dismissed. In the plea agreements in those cases, the taxpayers expressly admitted an intent to evade taxes for all the years of the indictment, despite being convicted for the last year alone.

Fiore was shrewder in his negotiation. He anticipated the government's strategy and crafted his plea accordingly. He didn't admit to tax evasion for any year other than 1999--the year of his conviction. Of course, the lack of an admission in the plea agreement doesn't foreclose a finding of fraud--but Fiore's plea agreement doesn't help the Commissioner establish fraud clearly and convincingly, either. And his 1999 conviction doesn't clearly establish that his returns for 1996 or 1997 were fraudulent. See Corson v. Commissioner, T.C. Memo. 1965-214, 1965 Tax Ct. Memo LEXIS 115, at \*18 ("Petitioner's conviction for filing false and fraudulent returns for the later years \* \* \* carries no presumption of fraud as to the earlier years"), aff'd, 369 F.2d 367 (3d Cir. 1966) This factor is neutral.

**[\*21]** <u>Willful Blindness</u>

So far, then, it's not clear whether Fiore had fraudulent intent. But underlying all the factors discussed above is another important question--was Fiore willfully blind to the unreported income?

Willful blindness is a relatively underdeveloped area of law in Tax Court jurisprudence--at least in fraud cases. In <u>Fields v. Commissioner</u>, T.C. Memo. 1996-425, 1996 WL 530108, at \*14, we mentioned willful blindness. Fields received advice from his attorney that he should report commission income and ignored the advice. <u>Id.</u> We reasoned that Fields's "lack of regard for [his attorney's] advice was for the primary purpose of evading taxes." <u>Id.</u> We added that, although not necessary to the conclusion,

> fraudulent intent can be found by reasonable inference drawn from proof that a taxpayer deliberately closed his or her eyes to what would otherwise have been obvious to him or her \* \* \* a trier of fact may infer that an individual knew of his or her evasion of tax from his or her willful blindness to the existence of that fact.

<u>Id.</u> <u>Fields</u> doesn't offer much guidance on how to apply the willful blindness standard to Fiore. Willful blindness wasn't the focus of the case and was mentioned only in passing.

We have addressed willful blindness--without calling it that--in the context of the failure to use available records in fraud cases. In <u>Cole v. Commissioner</u>,

**[\*22]** T.C. Memo. 1998-452, 1998 WL 892751, the taxpayer ran a medical practice that received cash and check payments daily. The business receipts were recorded daily on "day sheets" and totaled for each day, month, and year by his secretary. Id., 1998 WL 892751, at \*2. They included the patient name, the service provided, the fee for that service, and whether the patient paid by cash or check. Id. Cole had access to the day sheets, as well as the business bank statements, but did not use them in preparing his return. Id. We found fraud based in part upon his failure to use the business records that were available to him. Id., 1998 WL 892751, at \*6.

And in Spill v. Commissioner, T.C. Memo. 1989-213, 1989 Tax Ct. Memo LEXIS 213, the taxpayer owned Filly's Fashions, a clothing store in Brooklyn.[5] Filly's employed a bookkeeper who kept two sets of books. Id., 1989 Tax Ct. Memo LEXIS, at \*4. The first set purported to record daily cash receipts, but merely recorded what was deposited into the business bank account. Id. The

---

[5] Fraud was not the only mischief going on--after a business dispute, a competitor threatened to "bury" Spill, and Filly's soon burned to the ground. Spill v. Commissioner, T.C. Memo. 1989-213, 1989 Tax Ct. Memo LEXIS 213, at \*18. Spill found a new location for his store, but shortly after he moved there, it was firebombed. Id. We were careful to note that the competitor was killed before the trial when, after defaulting on a loan from an unregulated segment of the financial industry, he was killed in an "accident". See id., 1989 Tax Ct. Memo LEXIS, at \*18 n.6. (Brooklyn was apparently rough before it became hip.)

**[\*23]** second set of books included a record of all daily sales--including amounts diverted elsewhere. Id. We reasoned that "fraud is evidenced by the fact that petitioners kept a record of daily sales which they did not use in preparing their returns." Id. at \*17.

Willful-blindness fraud is more thoroughly described in criminal law. See generally Ira P. Robbins, "The Ostrich Instruction: Deliberate Ignorance as a Criminal Mens Rea," 81 J. Crim. L. & Criminology 191 (1990). An old English case, Regina v. Sleep, 169 Eng. Rep. 1296 (1861), was the first to name the concept, but it made its way to America by the late 19th century. See, e.g., People v. Brown, 16 P. 1 (1887). Willful blindness started showing up more frequently in the 1970s. The Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, sec. 401, 84 Stat. at 1260 (current version at 21 U.S.C. sec. 841(a) (2006)), prohibits the *knowing* importation of controlled substances and the *knowing* possession of such substances with intent to distribute. 21 U.S.C. sec. 841(a)(1) (emphasis added). Savvy drug traffickers saw a convenient defense to the knowledge element in deliberate ignorance. Prosecutors got around this problem through jury instructions equating deliberate ignorance with actual knowledge. The instruction spread to other prosecutions, including tax crimes. United States v. Egenberg, 441 F.2d 441, 444 (2d Cir. 1971).

**[*24]** <u>United States v. Jewell</u>, 532 F.2d 697 (9th Cir. 1976), has been widely adopted as a framework for evaluating willful-blindness crimes.[6] Jewell and a friend drove a rented car from Los Angeles to Tijuana to "have a good time." While they were enjoying themselves at a Tijuana bar, a man who identified himself as "Ray" approached them and offered marijuana for sale. They declined. Ray then offered to pay them $100 for driving a car north across the border. Jewell accepted the offer, but his friend didn't want any part of it and drove the rented car back to L.A. alone. When Jewell picked up the car, he opened up the trunk and noticed a secret compartment. He didn't check what was inside, even though he suspected contraband was there. He got busted when a border patrol agent found 110 pounds of marijuana in the secret compartment, and was charged with knowingly possessing marijuana. 21 U.S.C. sec. 841(a)(1). The trial court gave a willful-blindness jury instruction,[7] and Jewell was convicted.

---

[6] "Since *Jewell* was decided in 1976, every circuit--with the exception of the D.C. Circuit--has adopted its central holding. Indeed, many colloquially refer to the deliberate ignorance instruction as the '*Jewell* instruction.'" <u>United States v. Heredia</u>, 483 F.3d 913, 918 (9th Cir. 2007) (en banc).

[7] The instruction allowed the jury to find that the government met its burden if "the defendant was not actually aware that there was marijuana in the vehicle he was driving when he entered the United States his ignorance in that regard was solely and entirely a result of his having made a conscious purpose to disregard the nature of that which was in the vehicle, with a conscious purpose to avoid learning

(continued...)

[*25] <u>See</u> <u>Jewell</u>, 532 F.2d at 699. On appeal, Jewell argued that positive knowledge of the hidden marijuana was necessary to convict him. The Ninth Circuit affirmed the trial court, adopting the Model Penal Code definition of "knowingly".[8] The court also noted that, "the required state of mind differs from positive knowledge only so far as necessary to encompass a calculated effort to avoid the sanctions of the statute while violating its substance." <u>Id.</u> at 704.

Later cases listed three elements for willful blindness:

- awareness of a high probability of criminal circumstances,

- deliberate avoidance of steps to confirm these criminal circumstances and

- the deliberate avoidance be motivated by a desire to avoid criminal responsibility.

---

[7](...continued)
the truth."

[8] "To act 'knowingly' * * * is not necessarily to act only with positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." <u>United States v. Jewell</u>, 532 F.2d 697, 700 (1976).

**[\*26]** <u>See, e.g.</u>, <u>United States v. Heredia</u>, 429 F.3d 820, 824 (9th Cir. 2005).  But

courts applied the factors inconsistently.  Some courts required only the first two

elements,[9] others all three.[10]

The Ninth Circuit--where appeal of this case would lie--revisited willful

blindness in <u>United States v. Heredia</u>, 483 F.3d 913 (9th Cir. 2007) (en banc).

Heredia borrowed her aunt's car to drive her mother to a nearby town.  She

suspected that drugs might be in the car because it reeked of laundry detergent, the

passengers carried a lot of cash and acted nervous, and her aunt's boyfriend was a

pothead.  At a border-control checkpoint, an officer stopped the vehicle and

discovered 350 pounds of marijuana wrapped in dryer sheets (an odor-masking

technique).  Heredia was charged with possession of a controlled substance with

intent to distribute under 21 U.S.C. section 841(a)(1).  The court gave the jury a

---

[9] <u>See, e.g.</u>, <u>United States v. Stadtmauer</u>, 620 F.3d 238, 257 (3d Cir. 2010); <u>United States v. Sdoulam</u>, 398 F.3d 981, 993 n.8 (8th Cir. 2005); <u>United States v. Jaffe</u>, 387 F.3d 677, 681 (7th Cir. 2004); <u>United States v. Espinoza</u>, 244 F.3d 1234, 1242 (10th Cir. 2001); <u>United States v. Scott</u>, 159 F.3d 916, 922 (5th Cir. 1998).

[10] <u>See, e.g.</u>, <u>United States v. Puche</u>, 350 F.3d 1137, 1148-49 (11th Cir. 2003); <u>United States v. Willis</u>, 277 F.3d 1026, 1031-32 (8th Cir. 2002); <u>United States v. Delreal-Ordones</u>, 213 F.3d 1263, 1268-69 (10th Cir. 2000); <u>United States v. Pac. Hide & Fur Depot, Inc.</u>, 768 F.2d 1096, 1098 (9th Cir. 1985).

**[\*27]** deliberate-ignorance instruction[11]–without the motivation-to-avoid-criminal-responsibility element--and she was convicted.  Prior to rehearing the case *en banc,* a majority of a three-judge panel from the Ninth Circuit overturned Heredia's conviction because they concluded the government had failed to establish that Heredia "deliberately avoided confirming her suspicion in order to provide herself with a defense."  Heredia, 429 F.3d at 828.  Judge Kozinski dissented, arguing that the third prong was not necessary for a finding of willful blindness.  Id. at 830-35.  Upon rehearing *en banc*, the court held that the "two-pronged instruction * * * met the requirements of *Jewell* and, to the extent some of our cases have suggested more is required * * * they are overruled."  Heredia, 483 F.3d at 920.  It reasoned that "the requirement that defendant have *deliberately* avoided learning the truth, provides sufficient protections for defendants."  Id.  In other words, the third element--that the deliberate avoidance be motivated by a desire to avoid criminal responsibility--need not be met for a willful blindness finding in the Ninth Circuit.

---

[11]  The relevant part of the jury instruction read as follows:  "You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant was aware of a high probability that drugs were in the vehicle driven by the defendant and deliberately avoided learning the truth."  Heredia, 483 F.3d at 917.

**[*28]** Judge Easterbrook has weighed in on the debate as well. In <u>United States v.</u>

<u>Ramsey</u>, 785 F.2d 184 (7th Cir. 1986), scamsters running a Ponzi scheme

"portray[ed] themselves as more gullible than the victims" and invoked a willful-

blindness defense. <u>Id.</u> at 186. The trial court's jury instruction was upheld, but

Judge Easterbrook did one better--offering a better instruction that would be

"simple, but sufficient":

> You may infer knowledge from a combination of suspicion and
> indifference to the truth. If you find that a person had a strong
> suspicion that things were not what they seemed or that someone had
> withheld some important facts, yet shut his eyes for fear of what he
> would learn, you may conclude that he acted knowingly, as I have used
> that word.

<u>Id.</u> at 190. Judge Easterbrook's approach forgoes the motivation-to-avoid-criminal-

prosecution element as well.

Of course, the case before us is a civil, rather than criminal, matter. But we

do look to <u>Jewell</u> and similar cases for guidance about willful blindness. <u>See, e.g.,</u>

<u>Christians v. Commissioner</u>, T.C. Memo. 2003-130, 2003 WL 21000920, at *7;

<u>Medieval Attractions N.V. v. Commissioner</u>, T.C. Memo. 1996-455, 1996 WL

583322, at *59. And since the beyond-a-reasonable-doubt standard of criminal

law is more stringent than the Commissioner's clear-and-convincing burden for

finding civil fraud, we think meeting the criminal standard is more than sufficient

[*29] to show the fraudulent intent behind false statements on tax returns that we're looking for here. We therefore hold that the Commissioner can meet his burden of showing fraudulent intent to evade taxes with clear and convincing evidence that a taxpayer was:

- aware of a high probability of unreported income or improper deductions, and

- deliberately avoided steps to confirm this awareness.

There is clear and convincing evidence that Fiore was aware of a high probability of unreported income for 1996 and 1997. Notwithstanding his busy schedule and administrative shortcomings, he must have known that there was a very high probability that he wasn't reporting all of his income. His educational background and work experience would alert him to the likely outcome of his haphazard income-estimation method--that he was likely failing to report substantial amounts of income. Fiore knew he was neglecting firm administration and running a high risk of not reporting taxable income.

And more importantly Fiore was certainly aware he was burning through a lot of cash. In 1995 he paid $150,000 to settle a malpractice claim and $85,000 for his Idaho cabin. He also started renting his closer-to-work apartment in 1995 for over $2,000 a month (while paying a mortgage at the same time). The pattern

 **[\*30]** continued into 1997, when he paid $100,000 for Idaho land, and then into 1998--when he paid $350,000 for a log house and barn. We find that he was thinking about his not-enough-cash problem in 1996 and 1997. And not paying all his taxes was a convenient solution--at least temporarily.

We also find that Fiore deliberately avoided steps to confirm the possibility of unreported income. He could have easily confirmed whether his estimates of gross income were correct by checking his business-account bank statements. He also had a three-ring binder for each taxable year that included a copy of all the bills and deposit slips. Fiore's failure to check the bank statements and binders before accounting for his income and preparing his taxes makes his case analogous to Cole and Spill--Fiore, like the taxpayers in those cases, had access to available records that he failed to use in preparing his returns.

Fiore in fact admitted to willful blindness "not for the purpose of defrauding the government, but rather, sadly, for the purpose of getting and keeping clients." At the very least, this is an admission that he believed his time was better spent on getting clients than confirming whether he reported all his income--even when he suspected that at least some taxable income wasn't being properly reported. We therefore find that Fiore was willfully blind, weighing in favor of finding fraud.

[*31] And with particular weight given to this willful blindness we find that the Commissioner has met his burden of proving by clear and convincing evidence that Fiore filed fraudulent returns. We cannot accept that a person of Fiore's intelligence, training, and experience was not aware when he filed his returns for 1996 and 1997--at a time when he knew his need for cash was ballooning--that there was a high probability that he was underreporting his income. And we find that he deliberately avoided steps that would have confirmed that underreporting, since all he had to do was read his monthly bank statements to verify the accuracy of his estimates of taxable income that he put on his returns.

Decision will be entered under

Rule 155.